# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Lisa McAllister and Brandon Summers,

     Plaintiffs

v.

Clark County,

     Defendant

Case No.: 2:24-cv-00334-JAD-NJK

**Order Denying Plaintiffs' Motions for Injunctive Relief, Granting in Part Defendants' Motions to Dismiss, and Denying Defendants' Motion to Stay Discovery**

[ECF Nos. 4, 5, 9, 37, 45]

A newly enacted ordinance in Clark County, Nevada, makes it a misdemeanor to stop, stand, or do something to cause someone to stop or stand along the pedestrian-bridge areas that span the resort corridor of the iconic Las Vegas Strip. Two local residents sue to have the law declared unconstitutional and enjoin its application: Brandon Summers, a violinist who plays on the bridges for tips, and Lisa McAllister, who requires the use of a wheelchair and can't always control when she needs to stop. Together, Summers and McAllister claim that the ordinance is facially vague under the Fourteenth Amendment and overbroad under the First Amendment. Summers also asserts an as-applied free-speech claim, alleging that he can no longer perform in this public space without the risk of prosecution. McAllister adds an Americans with Disabilities Act (ADA) claim, theorizing that the law would subject her to criminal punishment because of her disability. In defense, the County moves to dismiss all of the claims and stay discovery.

I grant the County's motion to dismiss McAllister's ADA claim because she lacks standing to bring it. But I deny all of the parties' other requests for relief because this case remains in its infancy and too much depends on a factual record that hasn't yet been developed

through discovery.  So this case moves forward on the plaintiffs' facial First and Fourteenth Amendment claims, Summers's as-applied free-speech claim, and their state-law analogs.

## Background[1]

### A.    The ordinance

In January 2024, the Clark County Commission enacted Clark County Code (CCC) 16.13.030, which makes it unlawful "for any person to (1) stop or stand within any pedestrian flow zone or (2) engage in any activity while within a pedestrian flow zone with the intent of causing another person who is within the pedestrian flow zone to stop or stand."  Pedestrian flow zones are defined to encompass the pedestrian bridges that sporadically cross the resort corridor of the Las Vegas Strip and up to 20 feet surrounding a touchdown structure (the "elevators, escalators, and stairways located on the public right of way associated with pedestrian bridges").[2] The ordinance has a single carve-out: people are "not in violation of this Section if they stop or stand while waiting for access to an elevator or escalator for purposes of entering or exiting a pedestrian flow zone."[3]  Violating CCC 16.13.030 is a misdemeanor offense, punishable by "imprisonment in the county jail for a term not to exceed six months or by a fine not to exceed one thousand dollars" or both.[4]

The ordinance's "purpose" provision justifies the new restriction as a means to "ensure public safety on the pedestrian bridges."[5]  It recounts that the bridges replace some street-level

---

[1] These facts are taken from plaintiffs' complaint (ECF No. 1) and the text of the ordinance at issue (ECF No. 10-1, *also available at* Clark County Code of Ordinances, Supplement 142 (last updated July 15, 2024), https://perma.cc/EH4U-59AG), and are not intended as findings of fact.

[2] CCC 16.13.020.

[3] CCC 16.13.030.

[4] CCC 16.13.050.

[5] CCC 16.13.010.

crosswalks on the Strip and were designed "for the specific purpose of facilitating such crossing at all foreseeable levels of demand, which can vary significantly and unpredictably regardless of day or time of day."[6]  This provision asserts that the bridges are designed for stopping only for "incidental and fleeting viewing of the Las Vegas Strip," and that lengthier stops "create[] conditions that can foment disorder, which, in turn, can lead to crime and serious safety issues."[7]

The ordinance states that banning all stopping at all times is necessary because "it is impossible to know in advance when stopping will result in criminal or otherwise dangerous conditions."[8]  Because "of the physical nature of the bridges, by the time such conditions exist, it would often be too late for law enforcement or other first responders to intervene, mitigate, render aid, rescue[,] or take other actions necessary as a result of crime and other safety issues."[9]  The ordinance further recites that the pedestrian bridges "represent only six percent of the total linear feet of the public sidewalk available to pedestrians within the Las Vegas Strip," so there is ample space—the remaining 94% of the sidewalk system—for people to engage in First Amendment activity elsewhere in this public space.[10]

At the Commission meeting during which the ordinance was enacted, the County undoubtedly anticipated its application to people engaged in First Amendment activity.[11]  County counsel Lisa Logsdon averred that the ordinance doesn't impact street performers because they

---

[6] *Id.* (cleaned up).

[7] *Id.* (cleaned up).

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *See* ECF No. 1 at ¶¶ 35–47; *see also Clark County Bd. of Comm'rs Meeting* (January 2, 2024) at 1:02:51–1:37:03, *available at* https://perma.cc/5Y7X-LGDF.  The video recording of the Commission's meeting is cited and quoted extensively in plaintiffs' complaint and is thus incorporated by reference.

"can still do all of their street performing things down on the street level or if they're continuing to walk while they do any First Amendment activity" on the pedestrian bridges.[12]  The Commission expressed the intention that the ordinance be content neutral and apply equally to street performers and show girls.[13]  Logsdon also clarified that a person intending to cause another person to stop would be violating the ordinance only if both people were on the bridge, so "if there is picketing or different activity going on at the street level and somebody stops on the bridge, that is not covered by the ordinance."[14]  The plaintiffs interpret Logsdon's comment to mean that people who stop on a bridge to watch protesters below will not be cited under the law, though that appears inconsistent with the statute's complete ban on stopping or standing.[15]

After enacting CCC 16.13.030, Clark County explained on social media that the ordinance is "not interpreted to mean that tourists and locals cannot take photos along the [Strip] while on a pedestrian bridge."[16]  And Clark County Sheriff Kevin McMahill later told the Las Vegas Review-Journal that officers would not cite people for stopping to take pictures, but "those chronic individuals up there that are preying on our tourists and our locals that are visiting the Strip are just not going to have a place to do it anymore."[17]

---

[12] ECF No. 1 at ¶ 38.

[13] *Id.* at ¶ 40.

[14] *Id.* at ¶ 36.

[15] *See id.* at ¶¶ 76–77.

[16] *Id.* at ¶ 49.

[17] *Id.* at ¶¶ 50–52.

**B.     This lawsuit**

McAllister and Summers, represented by the American Civil Liberties Union of Nevada, filed this suit a month after the ordinance was enacted.  They allege that the law is impermissibly vague in violation of the Fourteenth Amendment.[18]  The term "stop or stand," plaintiffs argue, "does not provide a person of ordinary intelligence fair notice of what conduct is prohibited" because those words have a plain meaning different from the meaning that the County adopts by omitting "fleeting" views of the Strip or "brief" stops to take pictures.[19]  The plaintiffs also contend that the law "invites seriously discriminatory enforcement" because its broad reach gives law enforcement the power to interpret the law as it sees fit and punish only those considered to be "chronic individuals"—whatever that means.

The plaintiffs assert that the ordinance is facially overbroad in violation of the First Amendment, too.  In so doing, they allege that the "statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."[20]  They aver that the ordinance effectively prohibits performances by street performers and show girls,

---

[18] The plaintiffs also bring analog vagueness and free-speech claims under the Nevada constitution.  The scope of Nevada's free-speech protection is "coextensive to, but no greater than, that of the First Amendment to the United States Constitution," *S.O.C., Inc. v. Mirage Casino-Hotel*, 23 P.3d 243, 251 (Nev. 2001), and the standard that applies to the state-law equivalent "is identical to that under the First Amendment."  *Univ. & Cmty. Coll. Sys. of Nev. v. Nevadans for Sound Gov't*, 100 P.3d 179, 187 (Nev. 2004).  Nevada's due-process clause "mirrors its federal counterpart," so Nevada courts look to federal due-process authority to guide their analysis of claims brought under its analog.  *Dekker/Perich/Sabatini Ltd. v. Eighth Jud. Dist. Ct.*, 495 P.3d 519, 531 (Nev. 2021) (citing *Hernandez v. Bennett-Haron*, 287 P.3d 305, 310 (Nev. 2012)); *see also Sheriff, Washoe Cnty. v. Burdg*, 59 P.3d 484, 486–87 (Nev. 2002) (finding statute void for vagueness under both the U.S. and Nevada Constitutions and analyzing the claims under federal law to come to that conclusion).  So my rulings on the plaintiffs' federal constitutional claims extend to their analog state claims, too.

[19] ECF No. 1 at ¶¶ 64–80.

[20] *Id.* at ¶¶ 27 (quoting *Kashem v. Barr*, 941 F.3d 358, 375 n.9 (9th Cir. 2019) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973))).

solicitation of tips, and leafletting.[21]  And because Summers is a street performer who has performed on the bridges in the past, he brings an as-applied challenge because his future ability to perform on the pedestrian bridges is prohibited by the ordinance.[22]

McAllister adds that CCC 16.13.030 also violates the Americans with Disabilities Act (ADA).[23]  She explains that she has a disability that requires her to use a manual wheelchair to travel, and she cannot always control when she needs to stop moving.[24]  "For example, she must stop when there is a mechanical malfunction with her wheelchair, her arms tire from using [it], or when her vision of her path is blocked by other people who are walking in front of her."[25] McAllister "has used the pedestrian bridges . . . to travel through the resort corridor in her wheelchair," but the risk of criminal penalties from this new ordinance has "deterred [her] from returning to the area."[26]  She contends that the ordinance violates Title II of the ADA because it effectively makes the bridges inaccessible to her.

## C.   Pending motions

Plaintiffs move for a temporary restraining order and preliminary injunction prohibiting the County from enforcing CCC 16.13.030.[27]  They contend that they are likely to succeed on the merits of all their claims and that the ongoing violation of their constitutional and statutory rights

---

[21] *Id.* at ¶¶ 109–14.

[22] *See* ECF No. 49 at 6:17–24 (transcript of hearing on motions to dismiss and for injunctive relief, in which plaintiffs' counsel clarifies that they raise both a facial and an as-applied First Amendment challenge)

[23] ECF No. 1 at ¶¶ 131–51.

[24] *Id.* at ¶¶ 4–5, 146.

[25] *Id.* at ¶ 147.

[26] *Id.* at ¶ 17, 21.

[27] ECF Nos. 4, 5.  Plaintiffs' injunctive-relief motions are identical.  I cite only to ECF No. 4 in this order but my findings apply to both motions.

constitutes irreparable harm.[28]  The County moves to dismiss all of the plaintiffs' claims under

Federal Rule of Civil Procedure 12(b)(6).[29]  It takes issue with plaintiffs' facial challenges,

noting that such challenges are "disfavored" and contending that courts should avoid striking

down laws because doing so "frustrates the intent of the elected representatives of the people."[30]

And even if the plaintiffs' facial challenges were properly brought, the County reasons, neither

may proceed because the ordinance is not constitutionally vague and is a valid time, place, and

manner restriction on speech.[31]  The County also argues that McAllister's ADA claim fails

because the ordinance does not disproportionately impact people with disabilities.  The County

theorizes that anyone may have to stop or stand for fatigue or to remedy a wardrobe malfunction,

so the possibility that McAllister will have to unintentionally stop due to fatigue or malfunction

similarly plagues people without disabilities.[32]

After oral argument and briefing on the County's first motion to dismiss concluded, the

County filed a second motion to dismiss, this time under FRCP 12(b)(1).[33]  In it, the County

argues that McAllister lacks standing to bring her ADA claim because her alleged injury is

"premised on one of three infrequent, speculative, and hypothetical situations arising at the exact

moment when she happens to be crossing a pedestrian bridge on the Las Vegas Strip."[34]  The

---

[28] ECF No. 4 at 8–19.

[29] ECF No. 9.

[30] *Id.* at 6–7 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008), and *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984)).

[31] *Id.* at 11–16.  The Nevada Resorts Association filed an *amicus curiae* brief in support of the County's motion to dismiss plaintiffs' facial challenges.  ECF No. 11.

[32] ECF No. 9 at 18–21.

[33] ECF No. 45.

[34] *Id.* at 4.  The County raises several other arguments challenging McAllister's ADA claim on standing and FRCP 12(b)(6) grounds.  Because I need not and do not address those arguments, I

plaintiffs respond that the County is not permitted to bring a second motion to dismiss that essentially restates many of the same arguments it made in its first motion, and that under the Ninth Circuit's broad view of standing under the ADA, McAllister has sufficiently alleged a concrete injury because the threat of CCC 16.13.030's enforcement against her has deterred her from using the bridges.[35]

## Analysis

### A.      Motion-to-dismiss standards

District courts employ a two-step approach when evaluating a complaint's sufficiency on a Rule 12(b)(6) motion to dismiss.  The court must first accept as true all well-pled factual allegations in the complaint, recognizing that legal conclusions are not entitled to the assumption of truth.[36]  Mere recitals of a claim's elements, supported by only conclusory statements, are insufficient.[37]  The court must then consider whether the well-pled factual allegations state a plausible claim for relief.[38]  A claim is facially plausible when the complaint alleges facts that allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct.[39]  A complaint that does not permit the court to infer more than the mere possibility of misconduct has "alleged—but not shown—that the pleader is entitled to relief," and it must be dismissed.[40]

---

don't recount them here.

[35] ECF No. 46.

[36] *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

[37] *Id.*

[38] *Id.* at 679.

[39] *Id.*

[40] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

A challenge to a plaintiff's Article III standing is properly brought under FRCP 12(b)(1) because, if a plaintiff is without standing to assert her claims, the district court lacks subject-matter jurisdiction over her.[41]   "[T]he threshold question of whether [a] plaintiff has standing (and the court has jurisdiction) is distinct from the merits of [her] claim"; the standing question "precedes, and does not require, analysis of the merits."[42]   "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party."[43]

**B.      McAllister's ADA claim must be dismissed for lack of standing and for failure to state a plausible claim.**

Article III of the Constitution "confines the federal judicial power to the resolution of 'cases' and 'controversies.'"[44]   This limitation "is founded in concern about the proper—and properly limited—role of the courts in a democratic society."[45]   "One of the essential elements of a legal case or controversy is that the plaintiff have standing to sue,"[46] which "ensures that litigants have 'a personal stake in the outcome of the controversy as to justify the exercise of the court's remedial powers on their behalf.'"[47]

---

[41] *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1140 (9th Cir. 2003).

[42] *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011).

[43] *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

[44] *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting U.S. Const. amend. III, § 2) (cleaned up).

[45] *Summers v. Earth Island Ins.*, 555 U.S. 488, 492–93 (2009) (quoting *Warth*, 422 U.S. at 498) (cleaned up).

[46] *Trump v. Hawaii*, 585 U.S. 667, 697 (2018).

[47] *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 438 (2017) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976)).

To demonstrate Article III standing, a plaintiff must "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[48]  The injury must be "concrete and particularized," as well as "actual or imminent, not conjectural or hypothetical."[49]  To be particular, "it must affect the plaintiff in a personal and individual way."[50]  To be concrete, the injury "must actually exist."[51]  To establish traceability, the plaintiff must show that there is "a causal connection between the injury and the conduct complained of."[52]  To do so, "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement."[53]  "In the absence of contemporary enforcement," the Supreme Court has "said that a plaintiff claiming standing must show that the likelihood of future enforcement is 'substantial.'"[54]

The Ninth Circuit has recognized that the Supreme Court instructs courts "to take a broad view of Article III standing in civil rights cases, especially where, as under the ADA, private enforcement suits 'are the primary method of obtaining compliance with the Act.'"[55]  Under that

---

[48] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

[49] *Id.* at 339.

[50] *Id.* at 339–40.

[51] *Id.*

[52] *Lujan*, 504 U.S. at 560.

[53] *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

[54] *California v. Texas*, 593 U.S. 659, 670 (2021) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014)).

[55] *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1039 (9th Cir. 2008) (quoting *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972)).  Most of the Ninth Circuit cases discussing ADA standing do so in the context of Title III of the act, which regulates privately owned places of public accommodation.  McAllister brings her claim under Title II, which regulates government entities.  The standing analysis is the same for both claim types.  *See Kirola v. City & Cnty. of*

broad view, to establish an actual and imminent injury for deterrence standing, a plaintiff need only show that she "has visited a public accommodation on a prior occasion and is currently deterred from visiting that accommodation by accessibility barriers."[56]  It has also clarified that, to obtain injunctive relief, "a plaintiff must establish a sufficient future injury by alleging that [she is] either currently deterred from visiting the place of public accommodation because of a barrier, or that [she was] previously deterred and that [she] intend[s] to return to the place of public accommodation, where [she is] likely to reencounter the barrier."[57]

### 1. McAllister lacks standing to bring her ADA claim because she hasn't shown that her injury is actual, imminent, or real—or that the likelihood of future enforcement is substantial.

McAllister argues that she easily meets the Ninth Circuit's formulation of deterrence standing under the ADA.  She contends that she believes CCC 16.13.030 will criminalize unintentional stops due to her disability so she is thus deterred from using them.  But this case differs substantially from those in which deterrence standing was established.  In those ADA cases, the plaintiff visited a place of public accommodation and personally encountered a physical barrier or had actual knowledge that the barrier existed.[58]  Those physical-barrier cases

---

S.F., 860 F.3d 1164, 1774 n.3 (9th Cir. 2017).

[56] *Doran*, 524 F.3d at 1041 (citing *Pickern v. Holiday Quality Foods, Inc.*, 293 F.3d 1133, 1138 (9th Cir. 2002)).

[57] *Langer v. Kiser*, 57 F.4th 1085, 1094 (9th Cir. 2023).

[58] *See, e.g.*, *Doran*, 524 F.3d at 1038 (plaintiff alleged that defendant's store contained barriers like no van-accessible parking, a too-steep wheelchair ramp, too-narrow store aisles, etc.); *Kirola*, 860 F.3d at 1169 (plaintiff alleged that defendant city lacked curb ramps, had bumpy sidewalks that wheelchairs couldn't traverse, and maintained inaccessible pools, and the court found that her injuries were actual "because they have already happened"); *Pickern*, 293 F.3d at 1136 (alleging that "inadequate access to and from the parking lot; inadequate checkstand access; inadequate signs, and inadequate access to the restroom and to vending machines" prevented plaintiff from accessing the defendant's store); *Langer*, 57 F.4th at 1091 (alleging that defendant's parking lot didn't have van-accessible parking so plaintiff couldn't access the businesses on the defendants' property).

endorse the unremarkable notion that "a person with a disability need not engage in the 'futile gesture' of trying to access a noncompliant place just to create an injury for standing."[59]  That principle makes sense when physical barriers are at issue because no matter when a person with a disability visits a noncompliant place, that barrier will physically impede her access to the public accommodation.

In ADA cases involving discriminatory government policies, the barrier resulting from those policies has been equally unavoidable, causing injury even if a plaintiff hasn't yet been denied meaningful access to public services.  For example, in *Crowder v. Kitigawa*, the Ninth Circuit considered Hawaii's mandatory 120-day quarantine of all carnivorous animals entering the state—including guide dogs used by people with visual impairments—and found that, without reasonable modification, that requirement violated the ADA.[60]  Every dog coming into the state was subject to the quarantine under the Hawaii law, so all visually impaired people planning to enter the state could be certain that their guide dogs would be quarantined.

McAllister, in contrast, has not personally encountered any barrier to using the pedestrian bridges that cross the Strip, and it's entirely speculative that she ever will.  The series of causal events that must unfold before McAllister would indeed face a barrier to using the bridges shows how much more speculative her situation is than other ADA plaintiffs who are physically blocked from accessing the entities they sue: McAllister (1) must go to the Strip; (2) need to cross a bridge; (3) then get tired, encounter a wheelchair malfunction, or experience limited visibility; (4) causing her to stop on that bridge; (5) an officer needs to witness her stop for one

---

[59] *Langer*, 57 F.4th at 1093 (quoting *Pickern*, 293 F.3d at 1138).

[60] *Crowder v. Kitigawa*, 81 F.3d 1480, 1481 (9th Cir. 1996).  Though the panel in *Crowder* didn't analyze the plaintiffs' standing to pursue their claims, the difference in alleged injury is instructive here.

of those things; then (6) approach her and tell her to move on; and (7) cite or arrest her,
(8) despite her presumably telling the officer that she stopped because of her disability.

While this chain of events might be possible, McAllister has not shown that it is
plausible, let alone actual or imminent.  She has also not shown that the likelihood of future
enforcement against her is substantial because the chain of events is too attenuated to make any
fear of enforcement reasonable.  And the Ninth Circuit's guidance on deterrence standing isn't
applicable here because the events that McAllister believes deter her from visiting the Strip are
conjectural at best.  This is an issue that doesn't plague the other standing cases that McAllister
cites in support of her claim: physical barriers exist or they don't, and they bar access to public
services or they don't.  And extending the Ninth Circuit's deterrence-standing doctrine to these
circumstances would stretch it beyond the limits of Article III.  So because McAllister can't
sufficiently allege that she might actually encounter the injury she fears, she lacks standing to
bring her ADA claim.[61]

### 2.   *Even if McAllister could establish standing, she doesn't state a claim.*

Though standing should be the end of this inquiry, I acknowledge that McAllister's ADA
challenge to a facially neutral criminal ordinance that hasn't yet been employed to cite or arrest
people with disabilities appears to be a novel legal theory, relying on an assertion of standing
that hasn't yet been tested in the appellate courts.  So I address a second defect in this claim:

---

[61] McAllister characterizes the County's 12(b)(1) motion as a successive motion to dismiss that
should be denied as an improper "second bite at the apple."  ECF No. 46 at 3–5.  But the County
didn't address this standing issue in its first dismissal motion, and "a Rule 12(b)(1) motion to
dismiss for lack of subject matter jurisdiction, including for failure to allege injury sufficient for
Article III standing, may be made at any time," even after a Rule 12(b)(6) motion has been filed.
*In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 319 (9th Cir. 2017).  So the motion is not
improper.

even if McAllister has standing, she fails to state an ADA claim because she doesn't allege that CCC 16.13.030 disproportionately burdens her because of her disability.

### a. To state a disparate-impact ADA claim, a plaintiff must show that the law disproportionately burdens her due to her disability.

To prevail under Title II of the ADA, a "plaintiff must show that: (1) [s]he is a qualified individual with a disability; (2) [s]he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (2) this exclusion, denial, or discrimination was by reason of [her] disability."[62] "A city sidewalk is . . . a service, program, or activity of a public entity within the meaning of Title II."[63] And "[a]n individual is excluded from participation in or denied the benefits of a public program 'if a public entity's facilities are inaccessible to or unusable by individuals with disabilities.'"[64] "A disability-discrimination claim may be based on 'one of three theories of liability: disparate treatment, disparate impact, or the failure to make a reasonable accommodation.'"[65]

---

[62] *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014).

[63] *Id.* (cleaned up).

[64] *Daubert v. Lindsay Unified Sch. Dist.*, 760 F.3d 982, 985 (9th Cir. 2014) (quoting 28 C.F.R. § 35.149)).

[65] *Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 738 (9th Cir. 2021) (quoting *Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016)) (cleaned up).

1

2

### b.    McAllister's allegations don't demonstrate the requisite disparate impact.

3    McAllister's claim is rooted in the disparate-impact theory.[66]  She alleges that she "is

4    disabled due to a spinal injury and uses a manual wheelchair to travel,"[67] and the County doesn't

5    dispute that she qualifies as a person with a disability under Title II.[68]  The County primarily

6    takes issue with her allegation that CCC 16.13.030 disproportionately burdens people with

7    disabilities.  It contends that McAllister's concerns that she may have to stop on the bridge due to

8    fatigue, wheelchair malfunction, or low visibility might equally plague people without

9    disabilities at about the same frequency.[69]  Someone without disabilities may fatigue while

10   climbing the stairs to the bridge or exploring the Strip in Las Vegas's brutally hot summers,

11   experience a wardrobe malfunction (like a broken heel), and be unable to see over the crowds to

12   plot their next destination.  The County contends that McAllister's potential reasons for stopping

13   are no different or greater than those of people who do not have a disability affecting their

14   movement.

15       To establish a disparate-impact ADA claim, the plaintiff must show that a facially neutral

16   law "fall[s] more harshly on one group than another."[70]  The enforcement of that law must

17

18

---

19   [66] *See* ECF No. 15 at 9 (McAllister construing her claim as "a facial challenge against CCC
     16.13.030, which does not provide exemptions or accommodations for people who must stop or
20   stand due to disability"); ECF No. 46 at 11 (noting that her claim is viable because "disparate
     impact on disabled people is actionable").

21   [67] ECF No. 1 at ¶ 16; ECF No. 1-2 at ¶¶ 4–5.

22   [68] ECF No. 9 at 18 (noting that "McAllister has adequately alleged that she is a 'qualified
     individual with a disability' for purposes of" the ADA).

23   [69] *Id.* at 18–20.

     [70] *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (analogizing disparate-impact claims in
     the employment context to those in the ADA context).

burden people with disabilities "in a manner different and greater than it burdens others."[71] McAllister, however, hasn't alleged anything of the sort. She states that it is enough for her to say that the law burdens her ability to cross the Strip because of her disability. And she argues that the County's contention that she hasn't shown a unique need to stop is at best a "factual dispute" because she "has alleged that she must stop due to her disability."[72]

But McAllister glosses over the finer point that the County is making: even accepting her allegations as true, she has not alleged facts showing that her need to stop is unique or that the law disproportionately burdens her because of her disability. CCC 16.13.030 may burden people with disabilities in a different way than it burdens people without disabilities (i.e., arm fatigue from operating a wheelchair versus leg fatigue from walking on the Strip), but McAllister has not alleged a particular application of the law that burdens her in a manner that doesn't burden people without disabilities.

The *Crowder* case illustrates the distinction between McAllister's claim and a properly supported one. The panel held that Hawaii's facially neutral quarantine law violated the ADA because it "burden[ed] visually impaired persons in a manner different and greater than it burden[ed] others": "because of the unique dependence upon guide dogs among many of the visually impaired, Hawaii's quarantine effectively denie[d]" the plaintiffs "meaningful access to state services, programs, and activities while such services, programs, and activities remain[ed] open and easily accessible by others."[73]

---

[71] *Crowder*, 81 F.3d at 1484; *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004).
[72] ECF No. 17 at 18.
[73] *Crowder*, 81 F.3d at 1485.

McAllister tries to analogize her situation to *Crowder*, arguing that, "just as the visually impaired have a unique dependence on guide dogs, those unable to walk have a unique dependence on mobility devices."[74]  This is true, but the way that the government regulation at issue interfered with that dependence in *Crowder* was materially different.  Hawaii's quarantine effectively banned the use of guide dogs for 120 days anytime someone traveled to Hawaii.  But here, no government regulation or persistent barrier prevents a person from using a wheelchair on pedestrian bridges or any city sidewalk.  McAllister alleges only that, because she uses a wheelchair, her reasons for stopping on a bridge in violation of CCC 16.13.030 are different in kind than anyone else's reasons for stopping.  I do not find that such allegations sufficiently state an ADA claim.

## C.   Plaintiffs have pled plausible First and Fourteenth Amendment facial challenges.

The plaintiffs assert facial challenges against the County's ordinance under the First Amendment free-speech clause and the Fourteenth Amendment's due-process clause.  While litigants typically lack standing to assert the constitutional rights of third parties,[75] there's an exception to the individualized-standing requirement "for broadly written statutes [that] may have such a deterrent effect on free expression that they should be subject to challenge even by a party whose own conduct may be unprotected."[76]  The Supreme Court has justified this exception—known as the overbreadth doctrine—"on the ground that it provides breathing room

---

[74] ECF No. 17 at 18.

[75] *See Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984) (noting the "the general rule that a litigant only has standing to vindicate his own constitutional rights").

[76] *Id.* at 798–99 (characterizing the overbreadth doctrine as an "exception to ordinary standing requirements"); *see also Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998).

for free expression."[77]  "Overbroad laws 'may deter or chill constitutionally protected speech,' and if would-be speakers remain silent, society will lose their contributions to the 'marketplace of ideas.'"[78]  The overbreadth doctrine thus "allows a litigant . . . to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak."[79]

Analysis of facial First Amendment and vagueness challenges proceeding under the Supreme Court's overbreadth doctrine advances in several steps.  First, the court asks whether the ordinance at issue implicates the First Amendment at all.[80]  Second, it must decide whether the ordinance burdens "a substantial amount of protected free speech, judged in relation to its plainly legitimate sweep."[81]  If it doesn't, the facial First Amendment analysis ends there, and the vagueness challenge moves forward only if "no set of circumstances exists under which the [ordinance] would be valid."[82]  If the ordinance does substantially burden speech, then the court must next determine whether it violates the First Amendment under the relevant principles (here, whether it's a valid time, place, or manner restriction).  And the court proceeds with its vagueness analysis even if some applications may be valid—if an ordinance "interferes with the right of free speech . . . a more stringent vagueness test applies."[83]

---

[77] *United States v. Hansen*, 599 U.S. 762, 769 (2023).

[78] *Id.* at 770 (quoting *Virginia v. Hicks*, 539 U.S. 113, 119 (2003)).

[79] *Hansen*, 599 U.S. at 770.

[80] *Moody v. Netchoice, LLC*, 144 S. Ct. 2383, 2394 (2024) (noting that, to properly analyze whether a law substantially burdens First Amendment activity, "a court must understand what kind of government actions the First Amendment prohibits"); *cf. United States v. Williams*, 553 U.S. 285, 293 (2008) ("The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers.").

[81] *Hicks*, 539 U.S. at 118–19.

[82] *Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494, 497 (1982).

[83] *Id.* at 499; *see also Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 940 (9th Cir. 1997) ("In a facial vagueness challenge, the ordinance need not be vague in all applications if it reaches

### 1.    At this stage, the plaintiffs have adequately alleged, and the County appears to concede, that the ordinance impacts First Amendment activity.

The plaintiffs allege that CCC 16.13.030 "impacts speech and expressive conduct on pedestrian bridges."[84]  They reason that performing, soliciting tips, leafletting, and stopping to listen to someone perform or to hand him a tip are all protected First Amendment activities that would be effectively prohibited under the ordinance's stop-or-stand restriction.[85]  At oral argument, they noted additional protected activities that would be impacted by the law: e.g., collecting signatures for a petition, seeking donations for a cause, and panhandling.[86]

The County "concede(s) for the purposes of [its] motion [to dismiss] that 'stopping' and/or 'standing' may implicate expressive conduct in certain situations depending on the context."[87]  That concession should be sufficient at this stage for me to move past this step.  But the County at various points in its briefs also insists that "CCC 16.13.030 is not a restriction on speech at all" because individuals can "still march, protest, demonstrate, perform, or speak on the subject pedestrian bridges so long as they do not stop or stand while doing so."[88]  And the County argues in its motion that "there is no context for the court to determine whether the

---

a substantial amount of constitutionally protected conduct.") (cleaned up); *Williams*, 553 U.S. at 304 ("Although ordinarily, a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others, we have relaxed that requirement in the First Amendment context, permitting plaintiffs to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech.").

[84] ECF No. 1 at ¶ 99.

[85] *Id.* at ¶¶ 109–13; ECF No. 17 at 11.

[86] ECF No. 49 at 9:1–7.

[87] ECF No. 9 at 9.

[88] *Id.* at 6 n.1; *see also* ECF No. 10 at 10–11 (arguing that the ordinance has "only an incidental impact on expressive conduct"); ECF No. 21 at 2 (arguing that the ordinance "only touches on an infinitesimal amount of constitutionally protected activity"); ECF No. 49 at 22:14–15 (arguing that "standing and stopping . . . are not integral to expressive conduct").

prohibition on stopping or standing is . . . expressive conduct imbued with sufficient communicative elements to warrant review under the First Amendment."[89]  So I briefly address whether the plaintiffs have sufficiently alleged that CCC 16.13.030 implicates the First Amendment.

       ***a.     A law burdens First Amendment conduct if it is narrowly and specifically directed at conduct commonly associated with expression.***

"Not every ordinance that burdens expressive conduct implicates the First Amendment."[90]  In *Arcara v. Cloud Books, Inc.*, the Supreme Court recognized at least two scenarios in which restrictions on conduct implicate the First Amendment.  The first is when the government "regulat[es] conduct that has an expressive element"; for example, when the government bans sleeping in parks, but demonstrators contend that sleeping in the park is a crucial expressive component of a protest concerning "the plight of homeless people."[91]  The second concerns statutes that, "although directed at activity with no expressive component, impose a disproportionate burden upon those engaged in protected First Amendment activities."[92]  The High Court has also recognized that a statute may "say[] nothing about speech on its face" but can still be subject to First Amendment scrutiny if "it restricts access to traditional public fora."[93]

---

[89] *Id.* at 8–9.

[90] *Nunez*, 114 F.3d at 950.

[91] *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 703–04 (1986) (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984)).

[92] *Id.*

[93] *McCullen v. Coakley*, 573 U.S. 464, 476 (2014).

Two Ninth Circuit cases illustrate how these scenarios might manifest: *Roulette v. City of Seattle* and *Nunez by Nunez v. City of San Diego*.  In *Roulette*, a Ninth Circuit panel rejected a facial challenge to Seattle's ban on sitting or lying down on certain public sidewalks during the daylight hours.[94]  It noted the judiciary's "ordinary reluctance to entertain facial challenges" and distilled from the case law "[t]he lesson . . . that a facial freedom-of-speech attack must fail unless, at a minimum, the challenged statute 'is directed narrowly and specifically at expression or conduct commonly associated with expression.'"[95]  Pointing out that "homeless people remain free to beg on Seattle's sidewalks," "[v]oter registrars may solicit applications for the franchise," "[m]embers of the Freedom Socialist Party may doggedly pursue petition signatures and donations or distribute educational materials[, a]nd the National Organization for Women may hold rallies or demonstrations," the panel concluded that "sitting or lying on the sidewalk" isn't "integral to, or commonly associated with, expression."[96]  So it rejected the facial challenge.[97]

At the other end of the spectrum is *Nunez*, in which minors and their parents lodged a First Amendment facial challenge against San Diego's juvenile-curfew ordinance that made it illegal for a minor "to loiter, idle, wander, stroll, or play in or upon the public streets, highways, roads, alleys, parks, playgrounds, wharves, docks, or other public grounds, public places and public buildings, places of amusement and entertainment, vacant lots or other unsupervised places" from 10 p.m. to dawn.[98]  The City leaned heavily on *Roulette*, insisting that the curfew

---

[94] *Roulette v. City of Seattle*, 97 F.3d 300, 303 (9th Cir. 1996).

[95] *Id.* at 304–05 (quoting *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 760 (1988)) (cleaned up).

[96] *Id.* at 304.

[97] *Id.* at 305.

[98] *Nunez*, 114 F.3d at 938 (quoting San Diego, Cal. Muni. Code Art. 8 § 58.01).

ordinance, like Seattle's sidewalk law, didn't restrict "conduct 'integral to, or commonly associated with, expression' that is subject to a facial challenge."[99]  It argued that the law did "not implicate the First Amendment because going out at night does not itself communicate a message."[100]  But the panel disagreed.  "Unlike the situation in" *Roulette*, it reasoned, "the San Diego curfew ordinance has an integral effect on the ability of minors to express themselves."[101]  Broader than the *Roulette* law due to its ban on "expression in all forums for one-third of the day," the curfew, the panel found, "prohibits conduct that is a necessary precursor to most public expression—thus qualifying as conduct 'commonly associated with' expression."[102]  So it "is directed narrowly and specifically at expression or conduct commonly associated with expression,' as required by *Roulette*."[103]

### b.      CCC 16.13.030 is directed at conduct commonly associated with expression.

While CCC 16.13.030 doesn't go quite so far as the *Nunez* curfew, the plaintiffs have sufficiently alleged that it imposes a permanent restriction that is substantially more impactful on expressive conduct than the ordinance in *Roulette*.  Plenty of performers, petition-gatherers, and those attempting to engage with passersby would find it overly burdensome to keep moving while doing so.  The County's insistence that such First Amendment activity can be done on the move ignores the temporal limitations placed on the ability to speak and to actively listen.  While a protestor may be able to march in protest, she could not stop to have someone sign a petition or

---

[99] *Id.* at 950 (quoting *Roulette*, 97 F.3d at 304).

[100] *Id.*

[101] *Id.* at 950–51.

[102] *Id.* at 950.

[103] *Id.* at 951 (quoting *Roulette*, 97 F.3d at 305).

to accept a donation or tip, play a stationary instrument like a piano or an amp-connected guitar,[104] or engage in one-on-one conversation with someone who wants to learn more about a cause without parading that person up and down the bridge.  Just as the curfew in *Nunez* had "an integral effect on the ability of minors to express themselves,"[105] CCC 16.13.030's prohibition on stopping and standing burdens individuals' ability to engage in at least some protected activity.

What further distinguishes this ordinance from the public-sidewalk restriction in *Roulette* and brings it closer in effect to the *Nunez* curfew law is its second clause, which criminalizes "engag[ing] in any activity while within a pedestrian flow zone with the intent of causing another person who is within the pedestrian flow zone to stop or stand."[106]  Plaintiffs argue that this addition "effectively bans . . . Summers and others from any one-on-one communications" and "bars people passing by to stop, observe him, and perhaps pull out their wallet to drop a dollar in his violin case."[107]  At oral argument, plaintiffs argued that this clause directly burdens First Amendment activity because it prohibits anyone from encouraging another person to stop and engage in discussion or expression.[108]

---

[104] The County suggests that, with modern advances in sound amplification, a performer can now use amps that connect to the body, allowing the performer to move while engaging in expressive activity, so the ordinance doesn't impact Summers as comprehensively as the plaintiffs suggest. ECF No. 21 at 6.  At this motion-to-dismiss stage, I credit as true the plaintiff's allegation that Summers cannot perform in his chosen fashion if CCC 16.13.030 is enforced.  The County's argument is better suited for summary judgment.

[105] *Nunez*, 114 F.3d at 950–51.

[106] CCC 16.13.030(2).

[107] ECF No. 15 at 6.

[108] ECF No. 49 at 8:8–9:22.

"A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more."[109]  An ordinance that prohibits a speaker from encouraging passersby to stop and listen or engage in a dialogue has real First Amendment implications.  It limits the speaker to fleeting conversations and robs him of the likely purpose of engaging in protected speech or performance: to have someone stop and listen.  It would greatly diminish the capacity for one-on-one communication—a medium lauded by the Supreme Court as "the most effective, fundamental, and perhaps economical avenue of political discourse."[110]  And as the pedestrian bridges form part of the sidewalk system on the iconic Las Vegas Strip, until the County proves otherwise I assume for purposes of this motion that they constitute traditional public fora[111] and thus "remain one of the few places where a speaker can be confident that he is not simply preaching to the choir."[112]  In sum, I find that the plaintiffs have sufficiently alleged that the ordinance as a whole

---

[109] *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017).

[110] *McCullen*, 573 U.S. at 488 (quoting *Meyer v. Grant*, 486 U.S. 414, 424 (1988)).

[111] The County doesn't address in its briefs whether the pedestrian bridges constitute traditional public fora.  *See* ECF No. 10 at 9–10 (seemingly accepting the plaintiffs' assertion that the bridges are traditional public fora and analyzing the ordinance under intermediate scrutiny); ECF No. 9 at 12 (noting that the bridges "are uniquely distinct from the rest of the sidewalk system" but failing to elaborate on whether that uniqueness distinguishes bridges as something other than a traditional public forum).  But at oral argument, it asserted (without elaboration or supporting authority) that the pedestrian bridges are not public fora because they are essentially "elevated crosswalks."  ECF No. 49 at 21:18–20.  For their part, the plaintiffs have alleged that the bridges are traditional public fora and cite at least one Ninth Circuit case acknowledging that, in a prior case, the Las Vegas Metropolitan Police Department agreed to a memorandum of understanding with two street performers stating that the bridges are traditional public fora.  ECF No. 4 at 14 (citing *Santopietro v. Howell*, 73 F.4th 1016, 1022 (9th Cir. 2023)).  I don't find at this point that such an MOU is binding on the County or dispositive of the issue.  But, left with nothing else, I assume for the purposes of deciding these motions that the pedestrian bridges are entitled to the same protections that apply to city sidewalks.

[112] *McCullen*, 573 U.S. at 476.

24

implicates the First Amendment because, like the *Nunez* curfew law, it restricts conduct integral to, or commonly associated with, speech and expression.

> **2.    The plaintiffs have adequately alleged that the ordinance burdens a substantial amount of constitutionally protected activity, but this threshold question cannot be further answered without the benefit of a better-developed factual record.**

To pursue "a facial challenge to the overbreadth and vagueness of a law," a court must "determine whether the enactment reaches a substantial amount of constitutionally protected conduct."[113]  "The Supreme Court has said that where the facial challenge involves conduct other than speech itself, the ordinance's overbreadth" must be both real and substantial when compared to its "plainly legitimate sweep."[114]  Essentially, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court for it to be facially challenged on overbreadth grounds."[115]  The "mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge."[116]  To perform this analysis, the parties and the court "must determine a law's full set of applications, evaluate which are constitutional and which are not, and compare the one to the other."[117]  The burden is on the plaintiff to demonstrate "from the text of [the law] and from actual fact" that substantial overbreadth exists.[118]

---

[113] *Hoffman*, 455 U.S. at 495.

[114] *Nunez*, 114 F.3d at 935 (quoting *Broadrick*, 413 U.S. at 615).

[115] *Taxpayers for Vincent*, 466 U.S. at 801 (cleaned up).

[116] *Id.* at 800.

[117] *Moody*, 144 S. Ct. at 2394.

[118] *N.Y. State Club Ass'n, Inc. v. City of N.Y.*, 487 U.S. 1, 14 (1988).

The County doesn't mention these standards in its motion to dismiss the plaintiffs' facial challenges.  Instead, it cites authority generically stating that facial challenges are disfavored.[119] It contends that the hypotheticals concocted in this case to support the facial nature of plaintiffs' claims are "egregious," pointing specifically to McAllister's allegations that she has been deterred from using the pedestrian bridges because she may be cited if she has to stop due to her disability.[120]  But McAllister's allegations relate only to her ADA claim, which is not brought as a "facial" challenge (the facial/as-applied distinction doesn't map to ADA claims in the same way it does to First Amendment claims) and has no relation to the facial challenges that the plaintiffs pursue on First and Fourteenth Amendment grounds.[121]  The plaintiffs also fail to elaborate on the balance between applications of the ordinance that hinder constitutionally protected expression versus those that do not.  They instead insist that they have alleged that the ordinance "reaches a substantial amount of constitutional activity"[122] and that is enough.

At this stage, the plaintiffs have pled sufficient facts to put the County on notice that they mount facial challenges based on the overbreadth doctrine and believe that the ordinance reaches a substantial amount of constitutional activity.  The County doesn't argue that plaintiffs must plead every alleged unconstitutional application of the law, and I find that such a level of detail is not required to adequately state an overbreadth claim.  Rather, as made clear through the Supreme Court's analysis of similar overbreadth claims in *Moody v. NetChoice, LLC*—a

---

[119] ECF No. 9 at 6–7.

[120] *Id.* at 7.

[121] The County briefly mentions the substantial-burden standard in its reply in support of the motion to dismiss, but it merely attempts to distinguish this case from *Nunez* by commenting on CCC 16.13.030's limited application to pedestrian bridges.  ECF No. 21 at 2–3.  I don't find that this argument is developed enough to analyze at this point, and it doesn't truly respond to the analytical framework as stated in *Moody*, 144 S.Ct. at 2383.

[122] ECF No. 17 at 4 (citing ECF No. 1 at ¶¶ 99–100, 110–13).

1 decision released after briefing on the instant motions had been completed—development of a

2 factual record is required to tease out this threshold question.[123]

3       Some district courts, when faced with a motion to dismiss a facial challenge based on the

4 overbreadth doctrine, have even determined that "weighing [a law's] legitimate applications . . .

5 against its potentially illegitimate applications would . . . benefit from a factual record," so any

6 determination at the motion-to-dismiss stage would be premature.[124]  I am persuaded by this

7 reasoning and find that, to determine the scope of the law's applications, development of a

8 factual record and more robust briefing on the question is required.  So I deny the County's

9 motion to dismiss plaintiffs' facial challenges to CCC 16.13.030 without prejudice to its ability

10 to renew those arguments with the proper procedural vehicle after discovery has concluded.

11       Because I deny the County's motion on this threshold issue, I decline to analyze the

12 merits of the plaintiffs' vagueness challenge.[125]  My analysis of plaintiffs' vagueness claim

13 changes significantly if I find that the ordinance doesn't burden a substantial amount of speech;

14 in that instance, I would analyze whether the law is vague in *all* of its applications.  But that

---

[123] *See Moody*, 144 S.Ct. at 2399 (noting that the record concerning the scope of the challenged laws' applications was "underdeveloped," so the High Court couldn't analyze the question in the first instance); *see also id.* at 2425–28 (Alito, J., concurring) (pointing out that the district courts in both cases didn't permit the defendants to engage "in discovery on this threshold issue[]" before ruling on the plaintiffs' injunction requests).

[124] *See Stark v. Patreon, Inc.*, 656 F. Supp. 3d 1018, 1039 (N.D. Cal. 2023); *Boelter v. Advance Mag. Publishers Inc.*, 210 F. Supp. 3d 579, 603 (S.D.N.Y. 2016) (noting that courts "cannot determine the degree of the [law's] plainly legitimate sweep as compared to any conceivably impermissible applications" on a motion to dismiss, highlighting that the "Supreme Court's jurisprudence in this area cautions against [the district court] making a blunt pronouncement as to the constitutionality of a state privacy law based solely on one or two hypotheticals").

[125] *Nunez*, 114 F.3d at 940 (reciting that, "[i]n a facial vagueness challenge, the ordinance need not be vague in all applications if it reaches a 'substantial amount of constitutionally protected conduct'"); *Williams*, 553 U.S. at 304 (noting that plaintiffs benefit from a relaxed vagueness standing if they can argue "that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech").

1  standard is relaxed if the ordinance does substantially burden speech.  To engage in either

2  analysis at this stage without the ability to adequately compare the constitutional and

3  unconstitutional applications of the law would just be spitballing.  But it's enough for purposes

4  of the instant motion that the plaintiffs have sufficiently alleged that the law is vague (a finding

5  that the County doesn't really contest).  So I deny the County's motion to dismiss plaintiffs'

6  facial vagueness challenge.

7
8  **D.     Plaintiffs have adequately alleged that the ordinance may violate the First Amendment as applied to Summers.**

9          Though I decline to undertake a vagueness analysis at this stage, I do consider the merits

10  of Summers's First Amendment claim because he mounts both a facial and an as-applied

11  challenge.[126]  Summers alleges that he's a street performer who solicits tips on the pedestrian

12  bridges and has been deterred from doing so for fear of prosecution under the new ordinance.[127]

13  The County responds that the ordinance is a valid, content-neutral restriction on expressive

14  activity that is narrowly tailored to its purpose of improving public safety on the bridges.[128]

15
16
17
18  [126] ECF No. 49 at 6:17–24 (wherein counsel for plaintiffs notes that their due-process claims are facial challenges, while their free-speech claims are "both facial and as-applied").  The County assumed that the plaintiffs brought their First Amendment claim as a facial challenge only, reasoning that because Summers hasn't been cited or arrested under the ordinance, he lacks standing to bring an as-applied challenge.  *See* ECF No. 9 at 6; ECF No. 49 at 20:22–21:10.  But in *Real v. City of Long Beach*, 852 F.3d 929, 934 (9th Cir. 2017), the Ninth Circuit clarified that a plaintiff need not wait to experience a violation to have standing to challenge a law that may violate his First Amendment rights; he just needs to allege that he experiences a "credible threat of prosecution" under the law.  Summers has alleged just that, and the County hasn't disputed that Summers would be violating the ordinance—and thus subject to arrest—if he attempted to play his violin while standing on the bridge.

23  [127] ECF No. 1 at ¶¶ 8–13, 109–111.

[128] ECF No. 9 at 8–13.

28

While I've found that the plaintiffs have sufficiently alleged that the ordinance at least implicates constitutionally protected activity, "to say [that an] ordinance presents a First Amendment issue is not necessarily to say that it constitutes a First Amendment violation."[129] Legislative bodies "may sometimes curtail speech when necessary to advance a significant and legitimate state interest."[130] "Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions."[131]

### 1.   CCC 16.13.030 is subject to intermediate scrutiny.

The parties appear to agree that CCC 16.13.030 is a content-neutral restriction on speech, at least for the purposes of this motion. They also agree that this is a time, place, and manner restriction to which intermediate scrutiny must be applied.[132] Under that standard, a government may place restrictions on First Amendment activity so long as the restrictions "are narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information."[133] "The government bears the burden of justifying the regulation of expressive activity in a public forum."[134]

---

[129] *Taxpayers for Vincent*, 466 U.S. at 803–04.

[130] *Id.* at 804.

[131] *Clark*, 468 U.S. at 293.

[132] *See Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994) (holding that intermediate scrutiny applies to "content-neutral restrictions that impose an incidental burden on speech"); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (applying intermediate scrutiny to content-neutral time, place, and manner restrictions on speech).

[133] *Ward*, 491 U.S. at 791.

[134] *Berger v. City of Seattle*, 569 F.3d 1029, 1035 (9th Cir. 2009) (citing *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983)).

### 2. The County cannot show at this nascent stage of the proceedings that the ordinance furthers a significant governmental interest, dooming its dismissal request.

The County claims public safety and "safe pedestrian access" as the significant government interests that compelled CCC 16.13.030's adoption.[135]  It contends that because the Ninth Circuit and Supreme Court have recognized those interests as significant in other cases, they should be so recognized here, ending this court's significant-interest inquiry.[136]  It is true that public safety and flow of traffic are generally considered significant government interests.[137]  But the court's "inquiry does not end there, because when the government seeks to regulate expression, even incidentally, to address anticipated harms, it must 'demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.'"[138]  Courts "may not simply assume that the ordinance will always

---

[135] ECF No. 9 at 11 (quoting CCC 16.13.010).  Amicus for the County suggests that "protecting a tourism-based economy" also serves a significant government interest furthered by the ordinance.  ECF No. 11 at 23.  The County itself doesn't advance that interest, so I don't evaluate it.

[136] *See* ECF No. 9 at 11; *see also* ECF No. 21 at 7 (arguing that "[t]he Supreme Court has held that a government has a strong interest 'in ensuring the public safety and order [and] in promoting the free flow of traffic on public streets and sidewalks'" and thus that "[p]laintiff's contention that [the] County does not have a significant interest in ensuring the safe flow of pedestrian traffic is contradicted by clear Supreme Court precedent." (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994))).

[137] *See, e.g.*, *Porter v. Martinez*, 68 F.4th 429, 443 (9th Cir. 2023) ("There can be no doubt that [an interest in traffic safety] is substantial." (citing *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507–08 (1981))); *see also Madsen*, 512 U.S. at 768 (noting that the government "has a strong interest in ensuring the public safety and order" and "in promoting the free flow of traffic on public streets and sidewalks"); *Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850, 858 (9th Cir. 2004) (finding that "interests in pedestrian and traffic safety, as well as in preventing traffic congestion, are significant").

[138] *Porter*, 68 F.4th at 443 (quoting *Turner*, 512 U.S. at 664); *see also Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1227 (9th Cir. 1990) (cleaned up) (noting that, though the government "need not show an actual terrorist attack or serious accident to meet its burden, it is not free to foreclose expressive activity in public areas on mere speculation about danger").

advance the asserted state interests sufficiently to justify its abridgement of expressive

activity"[139]; rather, they "must be persuaded that the law actually furthers the [government's]

asserted interest."[140]

Summers contends that the County has not met its burden to show that the anticipated

harms it bases the ordinance on are real and not merely conjectural.[141]  He notes that the County

hasn't cited a single instance in which stopping on the pedestrian bridges led to any public

disorder or public-safety risk.[142]  The County responds that it need not wait for disaster to strike

to prevent potential harm.  Plus, the "purpose" section of the ordinance sufficiently explains the

reasoning behind it and cites a report indicating that calls to law enforcement "for disorderly

conduct on the pedestrian bridges are almost twice as high" as calls on the rest of the Strip's

sidewalk system.[143]

But Summers disputes the import and relevancy of that data.  He contends that the

County's relied-upon statistics don't actually support the notion that the pedestrian bridges are

more prone to public-safety concerns or "crowd crush" than any other similarly busy stretch of

the Strip's sidewalk system, or that this ban on stopping and standing would actually alleviate

---

[139] *Taxpayers for Vincent*, 466 U.S. at 803 n.22 (collecting cases).

[140] *Porter*, 68 F.4th at 443.

[141] ECF No. 4 at 15; ECF No. 15 at 6–7.

[142] ECF No. 4 at 15.

[143] CCC 16.13.010.  The source of this statistic is a report that the County commissioned to evaluate public-safety concerns on pedestrian bridges.  The County didn't attach the report to any of its filings, insisting that the court can rely solely on the ordinance's purpose section to find that it has satisfied the significant-government-interest requirement.  *See* ECF No. 9 at 10–11; ECF No. 21 at 8 n.1 ("[I]t is [the County's] position that the Court need not review legislative minutes or evidence relied upon by the [Board of County Commissioners] in ruling on the clear questions of law presented in this case.").  Amicus for the County, however, did attach the report.  *See* ECF No. 11 at 35–43.  I limit my consideration of the report because the County largely disavows reliance on it at this stage.

any such concerns.[144]  Indeed, Summers asserts, that cited report acknowledges that those public-disturbance calls might not be crime-related and there is no indication that they reflect more arrests, citations, violence, or disorder on the pedestrian bridges than on the rest of the sidewalk system.[145]  The County offers little response to those criticisms, falling back instead on its argument that this court shouldn't question its supporting documentation.[146]

I find that Summers has sufficiently alleged that the County's significant interest in public safety is speculative, and the County has not met its burden at this early stage to show that it is not.  The County must do more than rest on its assertion that, so long as it shouts out a traditionally recognized public interest, the court can't second-guess the legislative process.[147]  While the burden on the County is not heavy, it requires more than the County offers here.[148]  So I find that the County has not shown that it has a real, nonspeculative interest in restricting activity on the pedestrian bridges at this stage.  That failure requires me to deny the County's motion to dismiss Summers's as-applied claim.

---

[144] *See* ECF No. 15 at 7; ECF No 17 at 12–13; ECF No. 30 at 4–6; *see also Foti*, 146 F.3d at 642 (finding that city's requirement that protestors holding signs be "actually moving" was unconstitutional because "the record before us does not establish a reasonable fit" between the regulation and the interest in maintaining the "safe and convenient circulation of sidewalks").

[145] ECF No. 30 at 4–5.

[146] *See* ECF No. 21 at 8–9.

[147] *See id.*

[148] *See Landmark Comm's, Inc. v. Virginia*, 435 U.S. 829, 843 (1978) ("Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake."); *Turner*, 512 U.S. at 666 ("That [the government's] predictive judgments are entitled to substantial deference does not mean . . . that they are insulated from meaningful judicial review altogether.  On the contrary, we have stressed in First Amendment cases that the deference afforded to legislative findings does 'not foreclose our independent judgment of the facts bearing on an issue of constitutional law.'" (quoting *Sable Comm'ns of Cal. Inc. v. FCC*, 492 U.S. 115, 129 (1989))).

**E.      Injunctive relief is an extraordinary remedy, and the plaintiffs haven't shown that an order enjoining the ordinance is warranted.**

A preliminary injunction is an "extraordinary" remedy "never awarded as of right."[149] The Supreme Court clarified in *Winter v. Natural Resources Defense Council, Inc.* that, to obtain an injunction, plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable injury in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest."[150] The Ninth Circuit recognizes an additional standard: if "plaintiff[s] can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiffs' favor,' and the other two *Winter* factors are satisfied."[151] Under either approach, the starting point is a merits analysis. I deny plaintiffs' injunctive-relief motions because they have failed to show a likelihood of success on the merits of their remaining claims.

### 1.      *Plaintiffs cannot show a likelihood of success on their facial-challenge claims because they didn't address the threshold substantial-burden analysis.*

For the same reasons that I deny the County's request to dismiss plaintiffs' facial challenges, I deny the plaintiffs' injunctive-relief request on those claims. The plaintiffs have not adequately shown that they have a likelihood of success on the merits of those claims because they don't truly address whether the unconstitutional applications of CCC 16.13.030 are substantial when compared to the constitutional applications. They instead focus on whether the

---

[149] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

[150] *Id.* at 20.

[151] *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

ordinance impacts First Amendment activity.  While that's a necessary part of the inquiry, the plaintiffs just don't take that extra step to explain that the applications of CCC 16.13.030 impacting protected activity are substantial when compared to the law's legitimate sweep.

The Supreme Court and the Ninth Circuit have recently cautioned courts against granting injunctive relief in cases with this posture.  In *Tucson v. City of Seattle*, the Ninth Circuit reversed the district court's order preliminarily enjoining a city ordinance criminalizing "writing, painting, or drawing" on public or private property without permission.[152]  The panel found that, "[b]y failing to inquire into the [ordinance's] numerous lawful applications, the district court was unable to analyze whether the number of unconstitutional applications was 'substantially disproportionate to the statute's lawful sweep,'" and thus the court erred in granting an injunction on the plaintiff's facial challenge.[153]

In *Moody v. Netchoice,* the plaintiff mounted facial attacks against state laws recently passed in Florida and Texas that sought to regulate content moderation on social-media platforms.[154]  The Eleventh Circuit upheld a preliminary injunction enjoining Florida's law, while the Fifth Circuit reversed a similar injunction against Texas's law.[155]  The Supreme Court vacated both decisions because "neither Court of Appeals properly considered the facial nature of NetChoice's challenge."[156]  "Neither court performed th[e] necessary inquiry" to "determine a law's full set of applications, evaluate which are constitutional and which are not, and compare

---

[152] *Tucson v. City of Seattle*, 91 F.4th 1318, 1322 (9th Cir. 2024) (cleaned up).

[153] *Id.* at 1328.

[154] *Moody*, 144 S. Ct. at 2393–94.

[155] *Id.* at 2394.

[156] *Id.*

the one to the other."[157]  Writing for the majority, Justice Kagan noted that, in the lower courts, both parties "treated the laws as having certain heartland applications, and mostly confined their battle to that terrain," but in doing so they "treated these cases more like as-applied claims than like facial ones," and the district courts erroneously followed suit.[158]

As in *Tucson* and *Moody*, plaintiffs have not sufficiently focused on the threshold analysis required to frame their claims as facial challenges.  They focus only on the First Amendment activity that they believe would be burdened by the law, but neither side briefed whether those allegedly impermissible burdens substantially outweigh the ordinance's permissible applications.  In this posture and in light of the underdeveloped record on this issue, I cannot find that plaintiffs have a likelihood of success on the merits of their facial challenges, so I deny preliminary injunctive relief on those claims.

### 2. Summers hasn't shown a likelihood of success on his as-applied First Amendment claim.

Injunctive relief is not available based on Summers's as-applied claim either.  Although the County did not meet its burden to show that the ordinance serves a significant government interest, neither has Summers shown a likelihood of success on the merits of that or any of the other intermediate-scrutiny factors.  While the County has not yet shown that its stated government interest is real and not speculative, the evidence and argument that the plaintiffs present to the contrary is not so compelling that it directs a finding that the County has no support for its significant government interest in traffic safety.  I am skeptical that, with further

---

[157] *Id.*

[158] *Id.* at 2397.

1  development of the record, Summers can adequately rebut the County's assertion that CCC

2  16.13.030 responds to real concerns about overcrowding on the pedestrian bridges.

3        Nor has Summers shown a likelihood of success on the merits of the narrow-tailoring

4  inquiry.  "For a content-neutral time, place, or manner restriction to be narrowly tailored, it must

5  not 'burden substantially more speech than is necessary to further the government's legitimate

6  interests.'"[159]  The regulation "need not be the least restrictive or least intrusive means of

7  serving" those interests, "[b]ut the government still 'may not regulate speech in such a manner

8  that a substantial portion of the burden on speech does not serve to advance its goals.'"[160]

9  Summers contends that the ordinance isn't narrowly tailored because two other laws regulate

10  much of the same conduct that CCC 16.13.030 does—one prohibits the obstruction of sidewalks,

11  the other bans disorderly conduct that would "tend to incite a disturbance."[161]  But the County

12  asserts that more regulation is needed for the bridges because of their unique structure and

13  potential for incidents occurring without easy police access, which necessitates anticipatory

14  action to prevent stopping or standing before it becomes an obstruction.  At this stage, it's a toss-

15  up whether or not that justification is sufficient to support the new ordinance, but the plaintiffs

16  haven't shown that the County can't demonstrate that the ordinance is narrowly tailored given

17  the additional harms it is trying to ameliorate.  Further development of the record is needed to

18  break this tie.

19        Summers hasn't shown a likelihood of success on the merits when it comes to the ample-

20  alternatives prong, either.  "The First Amendment does not guarantee the right to communicate

21

22  _____

[159] *McCullen*, 573 U.S. at 486 (quoting *Ward*, 491 U.S. at 799).

23  [160] *Id.* (quoting *Ward*, 491 U.S. at 799).

[161] *See* ECF No. 17 at 14 (citing CCC 16.11.020 and CCC 12.33.010(c)).

one's views at all times and places or in any manner that may be desired."[162]  The First

Amendment also "does not require that individuals retain the most effective means of

communication, only that individuals retain the 'ability to communicate effectively.'"[163]  The

County convincingly points out that the pedestrian bridges constitute a small part of the overall

sidewalk system on the Strip and that those engaging in stationary First Amendment activity can

to do so on the street-level sidewalks.  Plus, those who can engage in speech while moving are

free to continue doing so on the pedestrian bridges.  Summers retorts that the pedestrian bridges

hold special First Amendment value because they "provide people engaging in protected

activities visibility to those passing by on the pedestrian bridge, on the grade-level sidewalks,

and driving underneath the bridge," allowing people engaging in protected activities to reach a

wider audience than if they were just on the sidewalks.[164]  The bridges are also safer for people

engaging in protected activities because they "offer a unique space away from an accidental

bump or shove into adjacent traffic."[165]

All of this may be true, but the First Amendment doesn't guarantee a speaker's preferred

choice of venue,[166] and Summers hasn't shown that he can't perform as effectively on the street-

level sidewalks or reach his intended audience at other locations along the Strip.  So Summers

hasn't established a likelihood of success in rebutting the County's assertion that the remaining

---

[162] *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) (citations omitted).

[163] *Menotti v. City of Seattle*, 409 F.3d 1113, 1138 n.48 (9th Cir. 2005) (quoting *Taxpayers for Vincent*, 466 U.S. at 812)).

[164] ECF No. 4 at 16.

[165] ECF No. 17 at 15.

[166] *See Taxpayers for Vincent*, 466 U.S. at 812 (noting that "the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places").

public sidewalks are an acceptable, alternative venue for his First Amendment activity.  At this point, based on the arguments and limited evidence presented, I find that Summers's likelihood of success is at best a coin-flip—a success rate that doesn't merit injunctive relief.

**F.    The County's motion to stay discovery is moot.**

Still pending is the County's motion to stay discovery pending a determination on its first motion to dismiss.[167]  I have now ruled on that dismissal motion, so the motion to stay discovery is technically moot.  But I consider it to dispel the County's misguided notion that cases involving facial challenges need no discovery at all.  At a minimum, development of the factual record is needed to determine whether CCC 16.13.030's unconstitutional applications are substantial when compared to its constitutional ones—a threshold question for plaintiffs' facial challenges.[168]  And the County incorrectly assumes that plaintiffs' First Amendment challenge is facial only; Summers brings a surviving as-applied challenge too, and the County doesn't assert that discovery isn't warranted in such a challenge.  Indeed, fact discovery is necessary to determine (1) whether the County has met its burden to show that the ordinance responds to a real, rather than speculative, significant government interest; (2) whether the ordinance is narrowly tailored to that interest when compared to other narrower laws that prohibit similar conduct and whether the County considered alternatives that would have had a lesser impact on speech; and (3) whether ample alternatives truly exist for First Amendment activity on the

---

[167] ECF No. 37.

[168] *See generally Moody*, 144 S.Ct. at 2399 (noting that an "underdeveloped" record prevented the court from determining whether the challenged laws were properly subject to facial attack); *Stark*, 656 F. Supp. 3d at 1039 (denying motion to dismiss due to underdeveloped record on substantial-burden question).

Strip.[169]  So I reject the County's suggestion that this case can be decided without discovery, and I order the parties to file a joint stipulated discovery plan by September 4, 2024.

### Conclusion

IT IS THEREFORE ORDERED that plaintiffs' motions for a temporary-restraining order and preliminary injunction **[ECF Nos. 4 & 5] are DENIED.**

IT IS FURTHER ORDERED that Clark County's motion to dismiss for failure to state a claim **[ECF No. 9] is DENIED.**

IT IS FURTHER ORDERED that Clark County's motion to dismiss McAllister's ADA claim on standing grounds **[ECF No. 45] is GRANTED.**  McAllister's ADA claim is dismissed without leave to amend for lack of standing.

IT IS FURTHER ORDERED that Clark County's motion to stay discovery **[ECF No. 37] is DENIED**.  The parties must file a joint discovery plan by **September 4, 2024**.

_____
U.S. District Judge Jennifer A. Dorsey
August 21, 2024

---

[169] A glance at several binding First Amendment decisions reveals that courts expressly rely on factual evidence collected during discovery to properly analyze such issues.  *See, e.g.*, *Taxpayers for Vincent*, 466 U.S. at 801 (noting that the record supported the city's significant interest in banning the posting of signs in certain areas because "the record suggests that many of the signs posted in violation of the ordinance are posted in such a way that they may create safety or traffic problems that [the city] has tried to avoid"); *Porter*, 68 F.4th at 445 (noting that an expert's testimony "assisted the State in meeting its burden under intermediate scrutiny"); *McCullen*, 573 U.S. at 492–95 (relying heavily on evidence in the record to conclude that a state's buffer-zone law wasn't narrowly tailored to the state's interests).