**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

Lisa McAllister, Brandon Summers, and Jordan Polovina

Plaintiffs

v.

Clark County,

Defendant

Case No.: 2:24-cv-00334-JAD-NJK

**Order Granting Defendant's Motion for Summary Judgment, Denying Plaintiffs' Motion for Summary Judgment, Denying Remaining Motions as Moot, and Closing Case**

[ECF Nos. 103, 125, 142, 158, 160, 166]

A 2024 ordinance in Clark County, Nevada, makes it a misdemeanor to stop, stand, or do something to cause someone to stop or stand while on the pedestrian-bridge areas that span the resort corridor of the iconic Las Vegas Strip. Three local residents sue to have the law declared unconstitutional and enjoin its application: Brandon Summers, a street-performing violinist, Jordan Polovina, a street-performing cellist, and Lisa McAllister, who requires the use of a wheelchair and can't always control when she needs to stop. Together, the plaintiffs claim that the ordinance is facially vague under the Fourteenth Amendment and overbroad under the First Amendment. Summers and Polovina also assert an as-applied free-speech claim, alleging that they can no longer perform in this public space without the risk of prosecution.

The parties cross-move for summary judgment. Clark County contends that the ordinance doesn't target expressive conduct and, even if it did, it is a content-neutral restriction that is narrowly tailored to the County's interest in maintaining public safety on the pedestrian bridges. It also argues that the ordinance doesn't violate due process because it isn't vague in all of its applications. The plaintiffs disagree with all of these arguments, contending that stopping and standing is often integral to the expression of free-speech activity and attacking the

credibility of the data that the County has produced to support its contention that the ordinance addresses actual public-safety and traffic concerns. Several other motions are also pending: District Attorney Steve Wolfson moves to dismiss the claims against him for improper joinder, and the plaintiffs move to exclude the County's expert William Sousa and seek leave to file a reply in support of that motion.

I grant Clark County's motion for summary judgment and deny the plaintiffs' motion. I find that Clark County Code (CCC) 16.13.030 does not substantially burden constitutionally protected activity in relation to its plainly legitimate sweep, so the plaintiffs' facial challenges fail. And the County has met its burden to show that the ordinance is narrowly tailored to achieve the government's interests in public safety and the flow of traffic on pedestrian bridges, so plaintiffs' as-applied challenge fails too. I deny plaintiffs' motions related to Dr. Sousa's testimony because I do not consider his reports beyond what was presented to the County before enacting the ordinance, and I deny as moot Wolfson's motion to dismiss.

## Background

### A. The Clark County Board of Commissioners conducted studies and collected data and anecdotal evidence to support obstruction restrictions on the pedestrian bridges for more than a decade.

In its summary-judgment motion, the County provides an overview of the evidence before the Clark County Board of Commissioners when it considered enacting a new ordinance restricting conduct on the pedestrian bridges. The plaintiffs dispute the validity, methodologies, and conclusions of all this evidence. For now, I recount the information available to the Commission prior to enacting CCC 16.13.030, and I address those disputes, when necessary, throughout my analysis.

### *1. Pedestrian traffic studies conducted between 2012 and 2022 recommended that pedestrian bridges be designated as no-obstruction zones.*

Tourism is a crucial revenue stream in this town; in 2024, 41.68 million people visited Las Vegas, generating $384 million in room taxes and $13.57 billion in gaming revenue.[1] Las Vegas's tourism industry centers around "the Strip," a section of Las Vegas Blvd. containing hotels, resorts, casinos, restaurants, and live entertainment. The busiest section of the Strip, with the borders of Russell Road to the south and Sahara Blvd. to the North, is often referred to as "the Resort Corridor." The area has a blend of car and pedestrian traffic, with a sidewalk system covering 45,708 linear feet.[2]

In an effort to increase pedestrian safety on the Strip, the County has commissioned several studies on pedestrian traffic and congestion. In 1994, a Las Vegas Pedestrian Walkway Study recommended that, to limit "pedestrian conflicts with vehicles" and instances in which pedestrians would spillover into the street to avoid sidewalk crowds, walkways should be widened, obstructions should be removed, and "non-obstruction zones" should be established at crosswalks and driveway entrances.[3] The study also noted that pedestrian overpasses were already being considered for one of the busier intersections.[4]

Between 1990 and 2020, 17 pedestrian bridges were erected across various intersections in the Resort Corridor.[5] Those bridges replaced pre-existing street-level crosswalks at those

---

[1] ECF No. 103-2 at 2 (Las Vegas historic tourism statistics).

[2] ECF No. 103-5 at 3 (adding together the pedestrian-bridge and street-level sidewalk measurements).

[3] ECF No. 103-3 at 25.

[4] *Id.* at 7.

[5] ECF No. 103-4 at 2; ECF No. 143-1 at 4:7–8.

intersections. The bridges are elevated 17–25 feet above the ground, have widths between 16 and 24 feet, have high walls on both sides, and permit just two or three points of entry or exit.[6] The bridges are the only legal way to cross Las Vegas Blvd. at those intersections. The pedestrian bridges make up 2,478 linear feet, or 5.7%, of the sidewalk system along the Resort Corridor.[7]

In 2012, the County commissioned company Kimley Horn to conduct another pedestrian-traffic study of the Las Vegas Strip. That study measured traffic on the pedestrian bridges on a holiday weekend and a "typical Saturday," in 15-minute intervals, and found that most of the bridges did not exceed the acceptable "Level of Service" (LOS)—a grading system "representing the freedom of walkway mobility."[8] But it also noted that "[t]he free-flow walking speeds of the bridges were observed to be lower than those of the [street-level] walkways."[9] The study also counted the number of "non-permanent obstructions"—which measured only individuals identified as hand billers, street performers, solicitors, and vendors—and found that 11% of those obstructions were on or within 15 feet of a pedestrian bridge.[10] It observed that "as the average number of non-permanent obstructions increased, generally, the LOS decreased when pedestrian volumes were significant."[11]

The 2012 study recommended that, given the constrained widths of the pedestrian bridges, the pedestrian volumes, and the walkway LOS, the bridges should be designated as "no-

---

[6] ECF No. 103-5 at 6–20.

[7] *Id.* at 3.

[8] ECF No. 103-6 at 11, 71.

[9] *Id.* at 97.

[10] *Id.* at 100.

[11] *Id.* at 107.

obstruction zones."[12] It alternatively recommended that "non-permanent obstruction restrictions" should be implemented on some of the bridges on holiday weekends during only specific times of each day.[13]

In 2015, Kimley Horn conducted another study to update the 2012 results.[14] It found that the average number of non-permanent obstructions on the bridges had increased since 2012, and the "LOS decreased when pedestrian volumes were significant."[15] The study attributed the decrease in LOS to the increase in non-permanent obstructions because "the effective walkway width decreases and pedestrians are not provided the total walkway width for walking."[16] Kimley Horn again recommended that pedestrian bridges should be designated as no-obstruction zones.[17] And in 2016, Kimley Horn conducted another study focusing specifically on non-permanent obstructions and the impact of an increased police presence in areas where hand billers and vendors gathered.[18] That study concluded that "[t]he pedestrian bridges appeared to

---

[12] *Id.* at 146. The County states that the study also recommended amendment of "the relevant provisions of Chapter 16.11 to clarify that pedestrian bridges are for the prompt and safe movement of pedestrians and that, like crosswalks, stopping and standing on pedestrian bridges are prohibited." ECF No. 103 at 4 (quoting ECF No. 103-6 at 15). But the study does not recommend that change. The page that the County cites to is part of the review of background literature on the issue of pedestrian traffic, and merely summarizes the recommendations of the "Resort Corridor Workgroup" that was created by the Clark County Board of Commissioners and consisted of "executives from the gaming community, representatives from the Las Vegas Metropolitan Police Department, the Nevada Resort Authority, and Clark County." ECF No. 103-6 at 15. The study itself does not recommend a "stopping and standing" limitation. *See id.* at 146.

[13] ECF No. 103-6 at 145, 152.

[14] ECF No. 103-7.

[15] *Id.* at 98.

[16] *Id.* (cleaned up).

[17] *Id.* at 129.

[18] ECF No. 103-8.

be generally clear of non-permanent obstructions" during the data-collection period, but it also noted that "several pedestrian bridges were observed with large numbers of solicitors or performers grouped together during certain observation times."[19]

In 2022, the County commissioned yet another study on pedestrian traffic from Kimley Horn.[20] Though non-permanent obstructions on the Strip decreased that year, the study maintained its recommendation that pedestrian bridges be designated as no-obstruction zones.[21] It also recommended that one pedestrian bridge would benefit from an obstruction restriction from 9:30 a.m. on Fridays to 3:00 a.m. on Mondays.[22]

### ***2. In 2022, the County considered a proposed ordinance designating pedestrian bridges as no-obstruction zones.***

In 2022, the County Commission considered amendments to the public-sidewalks ordinances that would "clarify the definition of 'crosswalk' to include pedestrian overpasses and underpasses and to prohibit obstructive uses in, on, or within 20 feet of a touchdown structure."[23] The County's attorney Lisa Logsdon explained that the amendments would designate the pedestrian bridges as no-obstruction zones. The definition of "obstructive uses" already present in the municipal code exempted First Amendment activity from its scope, so Logsdon explained that the amendment wouldn't "infringe on any . . . First Amendment protections."[24] Las Vegas Metropolitan Police Department (Metro) captain Joshua Bitsko gave a presentation "detailing the

---

[19] *Id.* at 33 (cleaned up).

[20] ECF No. 103-9.

[21] *Id.* at 119.

[22] *Id.* at 113.

[23] ECF No. 103-11 at 39.

[24] *Id.* (cleaned up).

pedestrian safety concerns and the degradation to . . . public safety that is resulting on the pedestrian overpasses on the Strip."[25] He testified that the "stagnation of movement on the pedestrian bridges is causing opportunity" for violent crimes, robberies, and narcotic sales.[26] He explained that, "because of their elevated position, it is difficult for [Metro] officers at street level to see the crimes . . . occurring."[27]

Officer Monica Alnes presented "a series of pictures and videos" showing the impact of obstructions on the bridges.[28] She explained that the bridges are unique because they are elevated above street level, are walled on the sides, and have only two points of entry and exit. Officer Alnes testified that those unique characteristics make obstructions more likely to disrupt the flow of traffic on the bridges and cause crowds.[29] She also showed videos of unhoused individuals allowing their dogs to roam off-leash, vendors and solicitors setting up tables or standing near coolers, as well as "showgirls and sign holders" that were obstructing the flow of pedestrian traffic.[30] Officer Alnes also highlighted examples of people sleeping, urinating, doing drugs, selling drugs, engaging in illegal gambling, fighting, and lighting fires on the bridges and in the adjoining elevators.[31] Captain Bitsko testified that Metro officers have observed that stagnation of movement on the bridges contributes to many of the negative interactions on the bridges, and designating the bridges as no-obstruction zones would allow Metro to prevent that

---

[25] *Id.* at 40 (cleaned up).

[26] *Id.*

[27] *Id.*

[28] *Id.* at 41.

[29] *Id.*

[30] *Id.* at 42.

[31] *Id.* at 42–45.

stagnation before issues arise.[32] Some of the Commissioners expressed an interest in gathering more data on the public-safety issues that Metro officers observed.[33]

### ***3. Criminologist William Sousa authors a report analyzing crime and disorder on the pedestrian bridges.***

The Commissioners ultimately elected not to move forward with the proposed amendments in 2022. But after the hearing on those amendments, the County retained William Sousa, Director of the Center for Crime and Justice Policy at the University of Nevada Las Vegas (UNLV),[34] to "conduct an analysis of data relating to crime and disorder on the pedestrian bridges on the Las Vegas Strip to identify whether the evidence presented by [Metro] during the 2022 legislative hearing . . . was supported by data . . . ."[35] In his April 2023 report, Dr. Sousa analyzed "calls for service for disorder-related events on Las Vegas Boulevard" and concluded that such calls increased by 23% between 2018 and 2022.[36] Dr. Sousa defined "disorder" as a "broad range [of] conditions and behaviors that are not necessarily illegal (although they often are), but are nevertheless considered to be problematic in public spaces."[37] As examples, he identified "aggressive panhandlers who intimidate passersby, individuals engaging in street prostitution, people using drugs and alcohol in public, [] unruly teenagers who harass

---

[32] *Id.* at 47.

[33] *See id.* at 49–50.

[34] Dr. Sousa received his doctorate degree in criminology and criminal justice in 2003. ECF No. 127-7 at 8.

[35] ECF No. 103 at 11 (citing ECF No. 103-18).

[36] ECF No. 103-18 at 2.

[37] *Id.* at 3.

pedestrians[,] . . . litter along sidewalks, locations with evidence of public urination and defecation, or graffiti on walls of public buildings."[38]

Dr. Sousa concluded that though pedestrian bridges comprise "less than 6% of the sidewalk system along Las Vegas Boulevard, 11% of disorder-related calls occurred" on the bridges.[39] Dr. Sousa also opined that disorderly conduct on the bridges is "especially problematic" because that conduct contributes to obstructions and crowding.[40] He further noted that, because the bridges are effectively the only way to cross Las Vegas Blvd., pedestrians cannot avoid disorderly and obstructive conduct if it is taking place on those bridges.[41]

Dr. Sousa also provided an opinion related to the impact of obstructions on pedestrian bridges in "times of panic."[42] He concluded that, in the event of a mass incident on the Strip, people trying to escape a particular area using the pedestrian bridges would be particularly susceptible to "a phenomenon known as crowd crush," in which the density of a crowd trying to funnel through a narrow exit point would cause injuries.[43] The "rigidly confined" nature of the bridges would also make it difficult for first responders to access the bridge in the event of injuries.[44] Dr. Sousa opined that encouraging pedestrians to keep moving on the bridges would help reduce disorder and improve public safety.[45]

---

[38] *Id.*

[39] *Id.* at 2.

[40] *Id.* at 4.

[41] *Id.*

[42] *Id.* at 5.

[43] *Id.*

[44] *Id.*

[45] *Id.* at 6.

***4. The Commission adopts CCC 16.13.030 in early 2024.***

On January 2, 2026, the Commission held a hearing on a new proposed amendment to the Clark County Code that would eventually become CCC 16.13.030. Dr. Sousa presented his findings to the Commission, and Undersheriff Andy Walsh testified that Metro believed an ordinance in which "pedestrians are mandated to keep moving will greatly diminish the crime and disorder that occurs on the bridges and will improve public safety."[46] He noted that Metro officers have been concerned about the possibility of crowd crush on the bridges, especially during major events.[47] A representative from the Nevada Resorts Association also testified in support of the bill, while representatives from the ACLU of Nevada and UNLV's misdemeanor clinic testified in opposition. The County's attorney informed the Commission of her belief that this was a content-neutral time, place, and manner restriction that was narrowly tailored to a significant government interest.[48] The Commission unanimously adopted the ordinance, and it went into effect on January 16, 2024.[49]

**B. CCC 16.13.030 bans stopping, standing, or causing someone else to stop on the pedestrian bridges.**

CCC 16.13.030 makes it unlawful "for any person to (1) stop or stand within any pedestrian flow zone or (2) engage in any activity while within a pedestrian flow zone with the intent of causing another person who is within the pedestrian flow zone to stop or stand." Pedestrian flow zones are defined to encompass the pedestrian bridges that cross the Resort Corridor of the Las Vegas Strip and up to 20 feet surrounding a touchdown structure (the

---

[46] ECF No. 103-19 at 35.

[47] *Id.*

[48] *See generally id.*

[49] ECF No. 103 at 16.

"elevators, escalators, and stairways located on the public right of way associated with pedestrian bridges").[50] The ordinance has a single carve-out: people are "not in violation of this Section if they stop or stand while waiting for access to an elevator or escalator for purposes of entering or exiting a pedestrian flow zone."[51] Violating CCC 16.13.030 is a misdemeanor offense punishable by "imprisonment in the county jail for a term not to exceed six months or by a fine not to exceed one thousand dollars" or both.[52]

The ordinance's "purpose" provision justifies the new restriction as a means to "ensure public safety on the pedestrian bridges."[53] It recounts that the bridges replace some street-level crosswalks on the Strip and were designed "for the specific purpose of facilitating such crossing at all foreseeable levels of demand, which can vary significantly and unpredictably regardless of day or time of day."[54] This provision asserts that the bridges are designed for stopping only for "incidental and fleeting viewing of the Las Vegas Strip" and that lengthier stops "create[] conditions that can foment disorder, which, in turn, can lead to crime and serious safety issues."[55]

The ordinance states that banning all stopping at all times is necessary because "it is impossible to know in advance when stopping will result in criminal or otherwise dangerous conditions."[56] Because "of the physical nature of the bridges, by the time such conditions exist,

---

[50] CCC 16.13.020.

[51] CCC 16.13.030.

[52] CCC 16.13.050.

[53] CCC 16.13.010.

[54] *Id.* (cleaned up).

[55] *Id.* (cleaned up).

[56] *Id.*

it would often be too late for law enforcement or other first responders to intervene, mitigate, render aid, rescue[,] or take other actions necessary as a result of crime and other safety issues."[57] The ordinance further recites that the pedestrian bridges "represent only six percent of the total linear feet of the public sidewalk available to pedestrians within the Las Vegas Strip," so there is ample space—the remaining 94% of the sidewalk system—for people to engage in First Amendment activity elsewhere.[58]

**C. Plaintiffs challenge the constitutionality of CCC 16.13.030 on First Amendment and void-for-vagueness grounds.**

Plaintiffs Brandon Summers and Jordan Polovina are both street performers who have regularly performed on the sidewalks and pedestrian bridges in the Resort Corridor for years.[59] Summers plays the violin,[60] and Polovina plays the cello.[61] Both use small speakers to amplify their performances, and their intention in performing is to have people stop, listen, and give tips.[62] Polovina obviously cannot move while playing his cello, and neither performer can move while connected to an amplifier or while soliciting tips.[63] Since CCC 16.13.030 was enacted, Polovina has been instructed by law enforcement to "stop performing and leave a pedestrian bridge," has separately been warned by law enforcement that performing on the bridge violates

---

[57] *Id.*

[58] *Id.*

[59] ECF No. 142 at 10 (citing ECF No. 143-4 (Summers's declaration) and ECF No. 143-5 (Polovina's declaration)).

[60] ECF No. 143-4 at ¶¶ 5–7.

[61] ECF No. 143-5 at ¶¶ 5–7.

[62] *See generally* ECF Nos. 143-4; 143-5.

[63] *See generally id.*

the ordinance, and has been cited under the ordinance.[64] Plaintiff Lisa McAllister uses a manual wheelchair and cannot always control when she needs to stop, so she alleges that she has been deterred from using the bridges because she fears prosecution.[65]

The plaintiffs assert that the ordinance is facially overbroad in violation of the First Amendment. In so doing, they theorize that the "statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."[66] They aver that the ordinance effectively prohibits performances by street performers and show girls, solicitation of tips, and leafletting.[67] Summers and Polovina also bring an as-applied challenge because their future ability to perform on the pedestrian bridges is prohibited by the ordinance.[68]

The plaintiffs allege that the law is impermissibly vague in violation of the Fourteenth Amendment, too.[69] The term "stop or stand," plaintiffs argue, "does not provide a person of ordinary intelligence fair notice of what conduct is prohibited" because those words have a plain

---

[64] ECF No. 143-5 at ¶¶ 14–16.

[65] ECF No. 61 at ¶¶ 28–35.

[66] *Id.* at ¶ 50 (quoting *Kashem v. Barr*, 941 F.3d 358, 375 n.9 (9th Cir. 2019) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973))).

[67] *Id.* at ¶¶ 52–54.

[68] *Id.* at 18.

[69] The plaintiffs also bring analog vagueness and free-speech claims under the Nevada constitution. The scope of Nevada's free-speech protection is "coextensive to, but no greater than, that of the First Amendment to the United States Constitution," *S.O.C., Inc. v. Mirage Casino-Hotel*, 23 P.3d 243, 251 (Nev. 2001), and the standard that applies to the state-law equivalent "is identical to that under the First Amendment." *Univ. & Cmty. Coll. Sys. of Nev. v. Nevadans for Sound Gov't*, 100 P.3d 179, 187 (Nev. 2004). Nevada's due-process clause "mirrors its federal counterpart," so Nevada courts look to federal due-process authority to guide their analysis of claims brought under its analog. *Dekker/Perich/Sabatini Ltd. v. Eighth Jud. Dist. Ct.*, 495 P.3d 519, 531 (Nev. 2021) (citing *Hernandez v. Bennett-Haron*, 287 P.3d 305, 310 (Nev. 2012)); *see also Sheriff, Washoe Cnty. v. Burdg*, 59 P.3d 484, 486–87 (Nev. 2002) (finding statute void for vagueness under both the U.S. and Nevada Constitutions and analyzing the claims under federal law to reach that conclusion). So my rulings on the plaintiffs' federal constitutional claims extend to their analog state claims, too.

meaning different from the meaning that the County adopts by omitting fleeting views of the Strip or brief stops to take pictures.[70] The plaintiffs also contend that the law "invites seriously discriminatory enforcement" because its broad reach gives law enforcement the power to interpret the law as it sees fit and exercise its discretion to punish those engaged in protected conduct.[71] The parties cross-move for summary judgment on each of these claims.[72]

## Analysis

### A. Summary judgment standard

The principal purpose of the summary-judgment procedure is to isolate and dispose of factually unsupported claims or defenses.[73] The moving party bears the initial responsibility of presenting the basis for its motion and identifying the portions of the record or affidavits that demonstrate the absence of a genuine issue of material fact.[74] If the moving party satisfies its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show a genuine issue for trial.[75] "When simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both motions before ruling on each of them."[76]

---

[70] ECF No. 61 at ¶¶ 109–25.

[71] *Id.* at ¶¶ 126–35. I previously dismissed claims brought under the Americans with Disabilities Act by plaintiff Lisa McAllister. *See* ECF No. 51.

[72] ECF Nos. 103, 142.

[73] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[74] *Id.* at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

[75] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS 60 Minutes,* 67 F.3d 816, 819 (9th Cir. 1995).

[76] *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two,* 249 F.3d 1132, 1134 (9th Cir. 2001)).

**B. The plaintiffs' evidentiary objections are overruled.**

The plaintiffs raise what they call "evidentiary objections" to various presentations, reports, and testimony that was provided to the County during the Commission's consideration of CCC 16.13.030. They object to the presentation and representations made by Metro officers, arguing that Metro's opinions are inadmissible under Federal Rule of Evidence (FRE) 701 because the officers did not show that those opinions were based on personal observations.[77] They object to Dr. Sousa's testimony before the Commission and his report because he does not meet the expert-witness standards under FRE 702.[78] And they challenge various portions of the pedestrian studies conducted throughout the last decade because those studies would require expert testimony to bring in front of a jury.[79]

The plaintiffs fundamentally misunderstand my task. The County's evidence is made up of studies, reports, and testimony available to the Commission while it was considering whether to enact new ordinances regulating the flow of traffic on the pedestrian bridges. It is not new, independent evidence that must meet the rigors of the Federal Rules of Evidence for me to consider it. The Supreme Court has made clear that courts need only decide whether a legislature's determinations were "grounded on reasonable factual findings supported by evidence that is substantial for a legislative determination."[80] "While [courts] do not permit

---

[77] ECF No. 133 at 26.

[78] ECF No. 125.

[79] ECF No. 133 at 27–28.

[80] *TikTok Inc. v. Garland*, 604 U.S. 56, 78 (2025) (quoting *Turner Broad. Sys. Inc. v. FCC*, 520 U.S. 180, 224 (1997) ("*Turner II*")); *see also Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (noting that the Supreme Court has "permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and simple common sense" (quotations omitted)); *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002) (noting that "a municipality may rely on any evidence that is 'reasonably believed to be

legislative bodies to rely on shoddy data, we also will not specify the methodological standards to which their evidence must conform."[81] So I overrule the plaintiffs' evidentiary objections to the extent that they are based on the Federal Rules of Evidence. I also deny the plaintiffs' motion in limine to exclude Dr. Sousa as an expert in this case because I consider only his report and testimony that was presented to the Commission prior to the ordinance's enactment—I do not consider any additional reports or testimony he has provided in this case. Instead of striking any of the County's evidence, I address the plaintiffs' substantive arguments concerning whether that evidence supports the government's interests in enacting this legislation when they arise.

**C. The plaintiffs' facial challenges fail.**

The plaintiffs assert facial challenges to the County's ordinance under the First Amendment free-speech clause and the Fourteenth Amendment's due-process clause. While litigants typically lack standing to assert the constitutional rights of third parties,[82] there's an exception to the individualized-standing requirement "for broadly written statutes [that] may have such a deterrent effect on free expression that they should be subject to challenge even by a party whose own conduct may be unprotected."[83] The Supreme Court has justified this exception—known as the overbreadth doctrine—"on the ground that it provides breathing room for free expression."[84] "Overbroad laws 'may deter or chill constitutionally protected speech,'

---

relevant' for demonstrating a connection between speech and a substantial, independent government interest" (quoting *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51–52 (1986))).

[81] *Gammoh v. City of La Habra*, 395 F.3d 1114, 1126–27 (9th Cir. 2005).

[82] *See Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984) (noting "the general rule that a litigant only has standing to vindicate his own constitutional rights").

[83] *Id.* at 798–99 (characterizing the overbreadth doctrine as an "exception to ordinary standing requirements"); *accord*, *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998).

[84] *United States v. Hansen*, 599 U.S. 762, 769 (2023).

and if would-be speakers remain silent, society will lose their contributions to the 'marketplace of ideas.'"[85] The overbreadth doctrine thus "allows a litigant . . . to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak."[86]

Analysis of facial First Amendment and vagueness challenges proceeding under the Supreme Court's overbreadth doctrine advances in several steps. First, the court asks whether the ordinance at issue implicates the First Amendment at all.[87] Second, it must decide whether the ordinance burdens "a substantial amount of protected free speech, judged in relation to its plainly legitimate sweep."[88] If it doesn't, the facial First Amendment analysis ends there, and the vagueness challenge moves forward only if "no set of circumstances exists under which the [ordinance] would be valid."[89] If the ordinance does substantially burden speech, then the court must next determine whether it violates the First Amendment under the relevant principles (here, whether it's a valid time, place, or manner restriction). And the court proceeds with its vagueness analysis even if some applications may be valid—if an ordinance "interferes with the right of free speech . . . a more stringent vagueness test applies."[90]

---

[85] *Id.* at 770 (quoting *Virginia v. Hicks*, 539 U.S. 113, 119 (2003)).

[86] *Id.*

[87] *Moody v. Netchoice, LLC*, 603 U.S. 707, 718 (2024) (noting that, to properly analyze whether a law substantially burdens First Amendment activity, "a court must understand what kind of government actions the First Amendment prohibits"); *cf. United States v. Williams*, 553 U.S. 285, 293 (2008).

[88] *Hicks*, 539 U.S. at 118–19.

[89] *Moody*, 603 U.S. at 723 (cleaned up).

[90] *Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).; *see also Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 940 (9th Cir. 1997) ("In a facial vagueness challenge, the ordinance need not be vague in all applications if it reaches a substantial amount of constitutionally protected conduct.") (cleaned up); *Williams*, 553 U.S. at 304 ("Although ordinarily, a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others, we have relaxed that requirement in the First Amendment context, permitting plaintiffs to argue that a statute is overbroad because it

### *1. The plain language of the ordinance bans all stopping and standing on the pedestrian bridges, with one narrow exception.*

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers."[91] "In evaluating a facial challenge, [courts] 'must consider the [county's] authoritative constructions of the ordinance, including its own implementation and interpretation of it.'"[92] But courts "are not required to insert missing terms into the statute or adopt an interpretation precluded by the plain language of the ordinance."[93]

CCC 16.13.030 states:

> To maintain the safe and continuous movement of pedestrian traffic, it is unlawful for any person to (1) stop or stand within any pedestrian flow zone, or (2) engage in any activity while within a pedestrian flow zone with the intent of causing another person who is within a pedestrian flow zone to stop or stand. A person is not in violation of this section if they stop or stand while waiting for access to an elevator or escalator for purposes of entering or exiting a pedestrian flow zone.

The provision's language is plainly understood to completely prohibit stopping or standing in the pedestrian flow zone or causing anyone else to stop or stand while in a pedestrian flow zone. There is no exception for First Amendment activity—the only exception permits stopping while waiting for the elevator or escalator. Though both parties provide evidence of Metro's approach

---

is unclear whether it regulates a substantial amount of protected speech.").

[91] *United States v. Stevens*, 559 U.S. 460, 474 (2010) (quoting *Williams*, 553 U.S. at 293).

[92] *Lone Star Sec. & Video, Inc. v. City of Los Angeles*, 827 F.3d 1192, 1199 (9th Cir. 2016) (quoting *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992)).

[93] *Foti*, 146 F.3d at 639 (citing *Nat'l Advertising v. City of Orange*, 861 F.2d 246, 247 (9th Cir. 1988)).

to enforcing the ordinance that may permit short, fleeting stops on the bridges, I do not consider that information because the language of the statute is plain.

***2. Regardless of whether CCC 16.13.030 is directed at conduct commonly associated with expression, the regulation does not burden a substantial amount of constitutionally protected activity.***

In a previous order resolving the County's motion to dismiss and the plaintiffs' preliminary-injunction motion, I concluded that the plaintiffs had adequately alleged that stopping and standing is "conduct commonly associated with expression," reasoning that finding otherwise would overlook "the temporal limitations placed on the ability to speak and to actively listen."[94] But I did not make a determination about whether the ordinance burdens "a substantial amount of protected free speech, judged in relation to its plainly legitimate sweep"[95] because that question could not be answered "without the benefit of a better-developed factual record."[96] I do not revisit the question of whether the ordinance regulates conduct typically associated with expression because, assuming it does, the now-developed record shows that the provision does not substantially burden constitutionally protected speech.

To pursue "a facial challenge to the overbreadth and vagueness of a law," a court must "determine whether the enactment reaches a substantial amount of constitutionally protected

---

[94] ECF No. 51 at 20–25. In my order resolving the County's motion to dismiss and the plaintiffs' motion for a preliminary injunction, I analyzed CCC 16.13.030 in comparison to *Roulette v. City of Seattle*, 97 F.3d 300 (9th Cir. 1996), which held that an ordinance banning sitting or lying down on city sidewalks did not regulate expressive conduct, and *Nunez*, 114 F.3d 935, which struck down a curfew ordinance that prohibited minors from being on public streets from 10 p.m. to dawn. I held that stopping and standing was not similar enough to the ban on sitting or lying down in *Roulette*, reasoning that more First Amendment activity requires stopping to engage in a conversation or actively listen. ECF No. 51 at 22–25.

[95] *Hicks*, 539 U.S. at 118–19.

[96] ECF No. 51 at 25–27 (citing *Stark v. Patreon, Inc.*, 656 F. Supp. 3d 1018, 1039 (N.D. Cal. 2023); *Boelter v. Advance Mag. Publishers Inc.*, 210 F. Supp. 3d 579, 603 (S.D.N.Y. 2016)).

conduct."[97] "The Supreme Court has said that [if] the facial challenge involves conduct other than speech itself, the ordinance's overbreadth" must be both real and substantial when compared to its "plainly legitimate sweep."[98] Essentially, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court for it to be facially challenged on overbreadth grounds."[99] The "mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge."[100] To perform this analysis, the parties and the court "must determine a law's full set of applications, evaluate which are constitutional and which are not, and compare the one to the other."[101] The burden is on the plaintiff to show "from the text of [the law] and from actual fact" that substantial overbreadth exists.[102]

The plaintiffs allege that the text of CCC 16.13.030 "impacts speech and expressive conduct on pedestrian bridges."[103] They reason that the ordinance's plain language prohibits effectively all stopping, and "[s]topping is integral to both protected activities that draw crowds like street performing or protesting to more intimate communication such as soliciting, panhandling, or gathering petitions."[104] They also contend that the Kimley Horn pedestrian-traffic studies—which define "non-permanent obstructions" to include three categories of protected activity (hand billers, solicitors, and street performers) and one category of economic

---

[97] *Vill. of Hoffman Ests.*, 455 U.S. at 495.

[98] *Nunez*, 114 F.3d at 935 (quoting *Broadrick*, 413 U.S. at 615).

[99] *Taxpayers for Vincent*, 466 U.S. at 801 (cleaned up).

[100] *Id.* at 800.

[101] *Moody*, 144 S. Ct. at 2394.

[102] *N.Y. State Club Ass'n, Inc. v. City of N.Y.*, 487 U.S. 1, 14 (1988).

[103] ECF No. 61 at ¶ 207.

[104] ECF No. 142 at 22.

activity (vendors)—shows that the data supporting the impact of obstructions on the bridges measured First Amendment activity and almost no other stationary activity.[105] They argue that this is the only data the County relied on to enact CCC 16.13.030 and thus it is based solely on the presence of people engaging in protected conduct. The plaintiffs further cite arrest records to show that "[p]eople have [been] openly arrested or cited under CCC 16.13.030 for playing music, soliciting, and protesting on the pedestrian bridges."[106]

The County disagrees with the notion that stopping is integral to speech, noting that "people can still engage in a full range of protected activities like protests, performances, signature gathering (by walking alongside people and stopping after exiting pedestrian flow zones to obtain signatures), soliciting tips or donation sign-holding (by holding donation cans or bags and walking alongside pedestrians), etc., so long as people don't stop or stand in the pedestrian bridges or intend to induce someone else to stop while doing so."[107] It also notes that, of the 93 arrests for stopping and standing on pedestrian bridges between February and October 2024, only 16 of them could be considered related to First Amendment activity.[108]

The County further disputes the plaintiffs' contention that it relied on no other evidence of stopping and standing on the bridges other than the Kimley Horn studies. The County also heard presentations and testimony from Metro officers concerning crowds formed due to stopping and standing on the bridges, including homeless individuals who had off-leash dogs or

---

[105] *Id.*

[106] *Id.*

[107] ECF No. 103 at 21.

[108] ECF No. 123 at 13 (citing ECF No. 123-12). The County takes issue with the plaintiffs' determination that 16 arrests were indeed related to First Amendment activity, arguing that the plaintiffs didn't identify which arrests qualified, "depriving Clark County of an opportunity to meaningfully respond." *Id.* Even if I assume that plaintiffs' characterization is accurate, that evidence doesn't support a finding that the ordinance substantially burdens speech.

large items or tables, or who were intoxicated, causing pedestrians to stop, engaged in unlicensed vending, urinating or defecating in public, using narcotics, pickpocketing, engaging in lewd acts, conducting illegal table games, soliciting donations based on fraudulent representations, engaging in physical altercations, camping on or vandalizing County property, blocking access to elevators and escalators thereby precluding ADA access, and engaging in arson.[109] Local businesses echoed concerns about the degrading safety of the pedestrian bridges, and Commissioner James B. Gibson represented that "he had personally viewed hours of video tape of similar conduct that did not make" it into Metro's presentation.[110]

After considering CCC 16.13.030's text, the evidence presented to the Commission to support its enactment, and the evidence of its enforcement, I conclude that the ordinance doesn't reach a substantial amount of constitutionally protected activity in relation to its plainly legitimate sweep. Though the law may outright prohibit a limited category of protected speech—namely, any conduct that cannot be conducted while on the move, like performing with a large instrument—it does not prevent any speech-related conduct that can be done while moving, and it legitimately reaches other unprotected conduct like sleeping, loitering, and vending. The commission relied on evidence showing that vast categories of unprotected conduct would be prohibited by the ordinance. And arrest records following CCC 16.13.030's enactment show that the majority of violative misconduct did not have speech implications at all. I thus conclude that First Amendment activity is not substantially burdened by CCC 16.13.030's prohibition on stopping and standing.

---

[109] *Id.* at 14.

[110] *Id.* at 15.

***3. Because CCC 16.13.030 doesn't reach a substantial amount of constitutionally protected conduct, the plaintiffs must show that the ordinance is vague in all of its applications to prevail on their void-for-vagueness claim.***

Because CCC 16.13.030 does not reach a substantial amount of constitutionally protected conduct, the plaintiffs' void-for-vagueness claim must be considered "outside of the First Amendment context."[111] The court thus examines the facial vagueness challenge to determine "only if the enactment is impermissibly vague in all of its applications."[112] This is the "most difficult challenge to mount successfully," and the government "need only demonstrate that the law is constitutional in some of its applications to prevail."[113]

The government has shown that CCC 16.13.030 has plenty of applications that do not burden free speech. The law prohibits people from sitting or sleeping on a bridge, stopping to engage in commercial activity, blocking access to elevators or escalators, and engaging in obstructive activity unrelated to speech if it blocks pedestrian access to the bridge. In any of those instances, the ordinance may be enforced without concern for infringing on constitutionally protected conduct or speech, and the plaintiffs don't argue otherwise.[114] So I conclude that both of the plaintiffs' facial challenges to the ordinance fail.

**D. The plaintiffs' as-applied challenge fails because the ordinance passes intermediate scrutiny.**

The plaintiffs also assert an as-applied First Amendment challenge to the ordinance. To evaluate an as-applied First Amendment challenge, the court must determine whether the

---

[111] *Imperial Sovereign Ct. of Mont. v. Knudsen*, 170 F.4th 820, 844 (9th Cir. 2026).

[112] *Village of Hoffman Ests.*, 455 U.S. at 495.

[113] *United States v. Stennerson*, 150 F.4th 1276, 1281 (9th Cir. 2025) (cleaned up).

[114] The plaintiffs address their vagueness claim only with the assumption that the less stringent First Amendment standard applies. I don't consider those arguments because CCC 16.13.030 doesn't substantially impact protected conduct.

plaintiff's activities are protected speech or conduct,[115] whether the restriction occurs in a public or non-public forum, and whether the restriction is a valid time, place, or manner regulation.[116] The parties dispute only the nature of the forum and whether the ordinance is a valid time, place, or manner restriction.

Clark County argues that the pedestrian bridges should not be considered a traditional public forum. Courts in this circuit consider three factors when determining whether a location is a public forum: "(1) the actual use and purposes of the property, particularly [its] status as a public thoroughfare and availability of free public access to the area; (2) the area's physical characteristics, including its location and the existence of clear boundaries delimiting the area; and (3) traditional or historic use of both the property in question and other similar properties."[117] The County acknowledges that the pedestrian bridges are freely accessible by the public, but it argues that the bridges are used as replacements for street-level crosswalks "at busy intersections to reduce vehicle-pedestrian accidents."[118] According to the County, this distinction, along with the unique physical characteristics of the bridges, warrants treating the bridges differently than

---

[115] The parties do not dispute that Summers and Polovina engage in First Amendment activity when they perform on the bridges. *See Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 65 (1981) (holding that "[e]ntertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee"); *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 567 (9th Cir. 1984) ("Music is a form of expression that is protected by the First Amendment." (cleaned up)); *Santopietro v. Howell*, 73 F.4th 1016, 1023–24 (9th Cir. 2023) (applying First Amendment analysis to challenge brought by Las Vegas street performers).

[116] *Gerritsen v. City of Los Angeles*, 994 F.2d 570, 576 (9th Cir. 1993) (citing *United States v. Grace*, 461 U.S. 171, 176–182 (1983)).

[117] *ACLU v. City of Las Vegas*, 333 F.3d 1092, 1100–01 (9th Cir. 2003) (citations omitted).

[118] ECF No. 103 at 23.

the rest of the sidewalk system.[119] The plaintiffs respond that the bridges are part of the Resort Corridor's sidewalk system that has repeatedly been held to constitute a public forum, courts in other states have held that pedestrian bridges are public fora, and that the purpose of the bridges (e.g., to replace crosswalks) has no place in the public-forum analysis.[120]

I find that I need not engage in this analysis because even if I assume that the bridges are traditional public fora and thus apply the most demanding test for a content-neutral restriction like CCC 16.13.030, the plaintiffs cannot prevail on their as-applied challenge. The parties agree that the ordinance is a content-neutral restriction. A content-neutral restriction on First Amendment activity in a traditional public forum may be a valid time, place, and manner restriction if it is "narrowly tailored to serve a significant governmental interest" and "leave[s] open ample alternative channels for communication of the information."[121] "The government bears the burden of justifying the regulation of expressive activity in a public forum."[122] And the County has met that burden.

### *1. The County has shown that the ordinance serves a significant governmental interest.*

When determining whether the government's interests support an ordinance, "courts must accord substantial deference to the predictive judgments" of the legislature.[123] "Sound

---

[119] *Id.*

[120] ECF No. 132 at 29–36; *see also ACLU*, 333 F.3d at 1104 (noting that "the intent of a government to create a nonpublic forum has no direct bearing upon traditional public forum status" (citing *Ark. Educ. Television Comm'n*, 523 U.S. 666, 678 (1998)).

[121] *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (applying intermediate scrutiny to content-neutral time, place, and manner restrictions on speech).

[122] *Berger v. City of Seattle*, 569 F.3d 1029, 1035 (9th Cir. 2009) (citing *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983)).

[123] *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994) ("*Turner I*").

policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deduction and inferences for which complete empirical support may be unavailable."[124] But deference does not replace the court's independent assessment of constitutional-law issues.[125] [W]hen the government seeks to regulate expression, even incidentally, to address anticipated harms, it must 'demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.'"[126] Courts "may not simply assume that the ordinance will always advance the asserted state interests sufficiently to justify its abridgement of expressive activity"[127]; rather, they "must be persuaded that the law actually furthers the [government's] asserted interest."[128] Exercising this independent judgment "is not a license to reweigh the evidence de novo or to replace [the legislature's] factual predictions" with the court's.[129] It is rather "to assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence."[130]

The County contends that CCC 16.13.030 serves its significant interests in "public safety and the flow of traffic on the pedestrian bridges."[131] It cites to the evidence presented throughout

---

[124] *Id.*

[125] *Id.* at 666 (quoting *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 129 (1989)).

[126] *Porter v. Martinez*, 68 F.4th 429, 443 (9th Cir. 2023) (quoting *Turner I*, 512 U.S. at 664); *see also Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1227 (9th Cir. 1990) (noting that, though the government "need not show an actual terrorist attack or serious accident to meet its burden, it is not free to foreclose expressive activity in public areas on mere speculation about danger" (cleaned up)).

[127] *Taxpayers for Vincent*, 466 U.S. at 803 n.22 (collecting cases).

[128] *Porter*, 68 F.4th at 443.

[129] *Turner I*, 512 U.S. at 666 (cleaned up).

[130] *Id.* (citation omitted).

[131] ECF No. 103 at 25; *see, e.g.*, *Porter*, 68 F.4th at 443 ("There can be no doubt that [an interest

the legislative history of CCC 16.13.030 and its unsuccessful predecessor as sufficiently demonstrative of real harms caused by individuals stopping and blocking the thoroughfares on the narrow pedestrian bridges.[132] It references Dr. Sousa's report and testimony explaining that the number of calls for disorder and related issues occurring on the pedestrian bridges is disproportionately higher than similar calls from the ground-level sidewalks.[133] It also cites the Kimley Horn studies recommending that because pedestrians tend to walk slower on the bridges, the County should make them obstruction-free zones.[134]

The plaintiffs dispute the validity of this evidence and the conclusions that the County drew from it.[135] They attack Dr. Sousa's report because of perceived inconsistencies between datasets related to the pedestrian bridges. They suggest that Dr. Sousa's findings about disorder-related calls cannot be trusted because he didn't independently verify the data that Metro provided, which could have classified disorder calls as originating on a bridge when those calls may have simply referenced a pedestrian bridge as a landmark. They contend that Dr. Sousa also blindly accepted the County's representation that the bridges make up only 6% of the sidewalk system—a measurement that the plaintiffs contend is bad math.[136] And they take issue with his

---

in traffic safety] is substantial." (citing *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507–08 (1981))); *see also Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994) (noting that the government "has a strong interest in ensuring the public safety and order" and "in promoting the free flow of traffic on public streets and sidewalks"); *Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850, 858 (9th Cir. 2004) (finding that "interests in pedestrian and traffic safety, as well as in preventing traffic congestion, are significant").

[132] ECF No. 103 at 26.

[133] ECF No. 123 at 15–17.

[134] ECF No. 103 at 26.

[135] *See* ECF No. 132 at 10–16, 41–43.

[136] The plaintiffs take issue with the sidewalk measurements because they believe that they should have been measured in square feet, not linear feet. ECF No. 132 at 10–12. This is the type of methodology questioning that the Ninth Circuit has warned against, *see Gammoh*, 395

findings related to "disorder" generally, contending that the report doesn't show that disorder is "synonymous with crime or danger."[137] The plaintiffs further question the conclusion that pedestrian bridges suffer from congestion issues, noting that the 2022 study available to the County did not show significant congestion and that many stretches of the street-level sidewalks had more congestion than the bridges. And the plaintiffs refute the County's characterization of the bridges as "unique," noting that many street-level sidewalks are narrower than the bridges.

The plaintiffs' approach effectively asks this court to engage in a reassessment and reweighing of the evidence that the County relied on to reach its conclusion that the legislation was necessary to control public safety and traffic issues on the pedestrian bridges. This the court cannot—so will not—do. The County relied on substantial evidence of concerns related to overcrowding on the pedestrian bridges, including data and recommendations from commissioned studies, the opinion of a criminologist, and data and testimony from Metro officers and business representatives. All of that evidence consistently relayed a concern that the pedestrian bridges are at unique risk for various reasons.

Though the plaintiffs focus on some less-than-perfect methodologies and results from those studies, I find that those concerns do not invalidate the general inference that movement restrictions on the pedestrian bridges are warranted to ensure public safety and manage traffic. The evidence before the Commission showed that pedestrian bridges are ripe for overcrowding if an obstruction is present and that disorder related to stationary activity on the bridges was causing problems that law enforcement could not solve with the tools already available to them. That conclusion remains clear from the evidence even if I accept the plaintiffs' characterization

---

F.3d at 1126–27, and the information that the plaintiffs criticize regarding sidewalk measurements does not amount to shoddy data that the court must disregard.

[137] ECF No. 132 at 41.

that some of the underlying data is flawed. So I conclude that the County has shown that its interests in public safety and pedestrian-traffic control on the bridges is real, not conjectural, and backed by substantial evidence supporting the legislature's reasonable inference that enacting CCC 16.13.030 could alleviate those harms.

### *2. The ordinance is sufficiently narrowly tailored to the County's interest in pedestrian safety.*

"For a content-neutral time, place, or manner restriction to be narrowly tailored, it must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'"[138] The regulation "need not be the least restrictive or least intrusive means of serving" those interests, "[b]ut the government still 'may not regulate speech in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'"[139]

The plaintiffs contend that, even if they concede that "congestion and public safety were actual risks on the pedestrian bridges, the County never explains how banning all stopping and standing within every pedestrian flow zone at all times address its stated concerns."[140] They argue that the congestion studies show that the bridges are busy sometimes—not all the time—and that some bridges are busier than others. They thus suggest that the County could have imposed time-based restrictions based on data confirming when the bridges are busiest. They also suggest that the County could have instead enforced the anti-obstruction ordinance already on the books or adopted a First Amendment carve-out to CCC 16.13.030.

---

[138] *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quoting *Ward*, 491 U.S. at 799).

[139] *Id.* (quoting *Ward*, 491 U.S. at 799).

[140] ECF No. 132 at 36.

To be narrowly tailored, an ordinance "need not be the least speech-restrictive means of advancing the Government's interests"[141]; it must simply promote "a substantial government interest that would be achieved less effectively absent the regulation."[142] "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative."[143]

The County has shown that its interests in public safety and traffic control on the pedestrian bridges are directly served by the stop-and-stand restriction. If individuals are prohibited from stopping or standing on the bridges, it is less likely that traffic will block the pathways. The law targets those who set up camp on the bridges or bring large instruments or amps on the bridges to perform, thereby removing the potential that those activities block the bridges. Could the government have proposed a less restrictive prohibition based on time of day or bridge location? Sure. Could it have targeted sleeping or sitting on the bridges? Yes. But what the government chose to do instead—banning all stopping and standing on the bridges in the Resort Corridor at all times—does not substantially burden speech and is not broader than necessary to achieve the government's interest. The government has sufficiently shown that it is difficult to predict when large crowds may be on the pedestrian bridges—particularly in light of the numerous large concerts, sports events, and conferences held on the Strip on any given day—which supports the restriction being in place at all times.[144]

---

[141] *Turner I*, 512 U.S. at 662.

[142] *Ward*, 491 U.S. at 799.

[143] *Id.* at 800.

[144] *See* ECF No. 123 at 18–19, 28–29.

The plaintiffs' suggestion that the County could have written in a carve-out for First Amendment activity does not change this result. The County convincingly shows that those engaging in stationary First Amendment activity can cause (and have caused) congestion and public-safety concerns on the bridges. It is only those First Amendment activities that the law prohibits. Metro officers convincingly testified to the Commission that the County's anti-obstruction ordinance wasn't sufficient because officers would have to wait until a blockade formed—and public-safety and traffic risks were already in action—before removing that obstruction. I credit that testimony to demonstrate that the Commission reasonably believed that additional regulation was needed to serve the County's interests. So I find that the ordinance is narrowly tailored to the problem—obstructions on bridges—and only affects the First Amendment activities that directly relate to that problem.

***3. There are ample alternatives for protected speech on the Las Vegas Strip.***

"The First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired."[145] The First Amendment also "does not require that individuals retain the most effective means of communication, only that individuals retain the 'ability to communicate effectively.'"[146] So for a restriction to survive intermediate

[145] *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) (citations omitted); *see also Taxpayers for Vincent*, 466 U.S. at 812 (noting that "the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places"); *Ctr. for Fair Pub. Policy v. Maricopa Cnty.*, 336 F.3d 1153, 1170 (9th Cir. 2003) (observing that "[t]he Supreme Court generally will not strike down a governmental action for failure to leave open ample alternative channels of communication unless the government enactment will foreclose an entire medium of public expression across the landscape of a particular community or setting" (citation omitted)).

[146] *Menotti v. City of Seattle*, 409 F.3d 1113, 1138 n.48 (9th Cir. 2005) (quoting *Taxpayers for Vincent*, 466 U.S. at 812)).

scrutiny, the government must also show that there are ample alternatives for expressive conduct and communication.

The County has shown that there are plenty of alternatives for plaintiffs to perform in Las Vegas's tourist corridor. If they must be stationary, the rest of the street-level sidewalks on the Strip are available to them. Those street-level sidewalks account for more than 90% of the pedestrian system, and performing on sidewalks near pedestrian bridges would reach the same audience. The ordinance regulates the manner of expressive conduct only in a small fraction of the sidewalk system. So I find that ample alternatives exist for Summers and Polovina to engage in First Amendment activity, even if they cannot perform on the pedestrian bridges.

**Conclusion**

IT IS THEREFORE ORDERED that Clark County's motion for summary judgment **[ECF No. 103] is GRANTED** and the plaintiffs' motion for summary judgment **[ECF No. 142] is DENIED.** The Clerk of Court is directed to **ENTER FINAL JUDGMENT** in favor of Clark County and against the plaintiffs.

IT IS FURTHER ORDERED that Steven B. Wolfson's motion to dismiss **[ECF No. 166] is DENIED as moot.**

IT IS FURTHER ORDERED that the plaintiffs' motion in limine to exclude William H. Sousa's testimony and motion for leave to file a reply in support of the motion in limine **[ECF Nos. 125, 160] are DENIED.**

IT IS FURTHER ORDERED that plaintiffs' motion for leave to file excess pages for their reply in support of their summary-judgment motion **[ECF No. 158] is GRANTED.** In deciding these matters, the court considered the entirety of the plaintiffs' oversized reply.

**The Clerk of Court is directed to CLOSE THIS CASE.**

U.S. District Judge Jennifer A. Dorsey
September 25, 2026